| | |
|---|---|
| MERCURY PROPERTIES, LLC and BULLHEAD ACRES, LLC, **On behalf of themselves and all other similarly situated persons and entities,** **Plaintiffs** -vs.- SYNGENTA CROP PROTECTION, AG, SYNGENTA CROP PROTECTION, LLC, SYNGENTA CORP., and CORTEVA, INC., **Defendants** | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE ANTITRUST LAWS** **CASE NO.: 1:23-cv-267** **JURY TRIAL DEMANDED** |

Plaintiffs Mercury Properties, LLC and Bullhead Acres, LLC (together, "**Plaintiffs**") bring this action on behalf of themselves and all other similarly situated persons and entities against Defendants Syngenta Crop Protection AG, Syngenta Crop Protection, LLC, and Syngenta Corp. (collectively, "**Syngenta**"), and Corteva, Inc. ("**Corteva**") (collectively, "**Defendants**"), including their unnamed co-conspirators, and allege the following:

## NATURE OF THE ACTION

1.      This is a class action for violations of the United States antitrust laws and the antitrust laws, consumer protection and unfair trade practices laws, and unjust enrichment common laws of several states. Defendants manufacture several crop protection products ("**CPPs;**" specifically, herbicides, insecticides, and fungicides) used by numerous American farmers, including Plaintiffs. Defendants' CPPs and the active ingredients contained in them enjoyed a period of patent protection and regulatory protection under which they were lawfully protected

1

from competition. Once these protection periods expired, competing generic manufacturers were allowed to produce their own versions of the CPPs, which typically drastically reduces the price of the CPPs.

2.      Here, to maintain their market dominance after their patent and regulatory protection of their CPPs expired, Defendants, from January 1, 2017 to the present (the "**Relevant Period**" or "**Class Period**") have used (and continue to use) restrictive agreements disguised as "loyalty programs" with large agricultural products distributors and retailers to block the availability of CPPs to farmers containing lower-priced generic versions of the following active ingredients ("**AIs**"): Syngenta's MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR, and Corteva's OXAMYL, RIMSULFURON, and ACETOCHLOR (collectively, the "**Relevant AIs**"). Under these "loyalty programs," Defendants made substantial payments to distributors, and in certain cases, retailers, in exchange for the distributors' and retailers' agreement to strictly limit their purchases of – and thereby prevent widespread distribution of – generic versions of Defendants' CPPs containing the Relevant AIs, ensuring that Defendants' far more expensive brand-name CPPs would be the vast majority of what the distributors and retailers purchased and sold to their customers.

3.      Since a small number of major distributors control a very large share of the CPP sales to retailers that, in turn, sell the CPPs to farmers, and since some of the distributors also own their own retail outlets, when there is a loyalty program in effect for a certain CPP manufactured by Defendants containing the Relevant AIs, the generic CPP manufacturers are foreclosed from nearly all the retail market for such CPP. When there is a loyalty program in place for a particular CPP manufactured by Defendants containing the Relevant AIs, the generic CPP manufacturers can typically only sell much smaller volumes of such CPP, or often cannot sell it profitably at all—forcing

2

them to exit the market or refrain from entering the market in the first place.

4.    Defendants' loyalty programs have negatively impacted the CPP market in the following ways (and continue to do so): (i) Defendants are able to maintain a near-monopoly for the sales of each of their CPPs containing the Relevant AIs even though patent and regulatory protection have expired and there should be open competition from generic CPP manufacturers, (ii) Defendants are able to continue to charge much higher prices for their CPPs containing the Relevant AIs as a result of excluding most generic competition, generating supra-competitive profits, (iii) Defendants share a portion of their supra-competitive profits with distributors and retailers to ensure their cooperation with this scheme, (iv) farmers pay much higher prices for CPPs containing the Relevant AIs than they otherwise would pay if there was free and open competition but for Defendants' wrongful conduct, and (v) generic CPPs containing the Relevant AIs are also priced higher than they would be priced if there were free and open competition but for Defendants' wrongful conduct.

5.    Defendants' anticompetitive scheme has reduced competition in the market for the CPPs containing the Relevant AIs, thereby artificially inflating the prices of such CPPs and of the CPPs manufactured by Defendants' generic competitors. Plaintiffs and the Class member farmers who purchased CPPs containing the Relevant AIs have been (and continue to be) injured by paying artificially inflated prices for such CPPs—for which they are entitled to compensation.

6.    Plaintiffs, on behalf of themselves and Class members, seek injunctive relief under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1-2), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), and seek damages under the antitrust laws, consumer protection and unfair trade practices laws, and unjust enrichment common laws of several states.

## **JURISDICTION AND VENUE**

7.    Plaintiffs bring this action under Sections 4(a) and 16 of the Clayton Act, 15 U.S.C.

3

§§ 15(a) and 26, to secure injunctive relief against defendants for violating Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2. Plaintiffs also bring these state law class claims on behalf of all the Classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' anticompetitive agreements and unlawful foreclosure of competition in the relevant markets that maintained and enhanced Defendants' dominant position and monopoly power. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

8.      This Court has jurisdiction over the federal claims under Section 16 of the Clayton At, 15 U.S.C. § 26, as well as under 28 U.S.C. §§ 1331, 1337. The Court has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy. Independently, this Court also has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1332 because the amount in controversy for each of the Classes exceeds $5,000,000 and there are members of some of the Classes who are citizens of a different state than Defendants.

9.      This Court has personal jurisdiction over each Defendant because each Defendant, throughout the United States, including in this District and the State of North Carolina, transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the above-described illegal scheme (and continues to do so). The alleged scheme was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, and/or doing business throughout the United States, including this District and the State of North Carolina.

10.      Defendants' above-described wrongful actions were (and continue to be) within the intended flow of commerce within the United States and had direct, substantial, and reasonably

foreseeable effects on interstate commerce.

11.     Venue is proper in this District because during the Relevant Period, one or more Defendants resided, transacted business, were found, or had agents in this District (and continue to do so), and a substantial portion of Defendants' alleged wrongful actions affecting interstate trade and commerce was carried out in this District.

12.     Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and/or the North Carolina long-arm statute because (i) each Defendant transacts and/or transacted business in North Carolina, (ii) the North Carolina long-arm statute extends jurisdiction to the limits of Due Process, and (iii) each Defendant has sufficient minimum contacts with the state of North Carolina to satisfy Due Process.

## PARTIES

### I.     Plaintiffs.

13.     Plaintiff Mercury Properties, LLC is a Wisconsin limited liability company and farming operation based in Slinger, Wisconsin, that purchased CPPs containing one or more of the Relevant AIs during the Relevant Period, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described and below-described wrongful actions.

14.     Plaintiff Bullhead Acres, LLC is a Wisconsin limited liability company and farming operation based in Slinger, Wisconsin, that purchased CPPs containing one or more of the Relevant AIs during the Relevant Period, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described and below-described wrongful actions.

5

## II. Defendants.

15.    The term "Defendants" includes Defendants and all their predecessors, successors, and assigns, including entities merged with or acquired by any Defendant, and each Defendant's current or former parent companies and/or wholly owned or controlled subsidiaries or affiliates, that marketed and sold CPPs containing the Relevant AIs in interstate commerce in the United States, including the Middle District of North Carolina, during the Relevant Period.

16.    Each Defendant marketed and sold CPPs containing the Relevant AIs and played a material role in the alleged anticompetitive behavior during the Relevant Period. All Defendants were active, knowing participants in the alleged anticompetitive behavior, and their conduct, to the extent committed by Defendants, was known to, and approved by, their parent companies, subsidiaries, and/or affiliates.

17.    Defendant Syngenta Crop Protection AG is a Swiss public limited company based in Basel, Switzerland. China National Chemical Company (ChemChina) acquired Syngenta in 2017. Thereafter, in May 2021, ChemChina merged with Sinochem Group Co., Ltd. The merged company is a subsidiary of Sinochem Holdings Corporation Ltd., which is a state-owned Chinese company based in Beijing, China. Syngenta Crop Protection AG's North American headquarters is in Greensboro, North Carolina.

18.    Defendant Syngenta Crop Protection, LLC, an affiliate of Defendant Syngenta Crop Protection AG, is a Delaware limited liability company based in Greensboro, North Carolina.

19.    Defendant Syngenta Corp., an affiliate of Defendant Syngenta Crop Protection AG, is a Delaware corporation based in Wilmington, Delaware.

20.    During the Relevant Period, Defendants Syngenta Crop Protection AG, Syngenta Crop Protection, LLC, and Syngenta Corp. (collectively, "Syngenta") transacted substantial business in the Middle District of North Carolina, including the research, development,

6

manufacture, sale, and marketing of CPPs containing the Relevant AIs.

21.    Defendant Corteva, Inc. is a Delaware corporation based in Indianapolis, Indiana. Defendant Corteva, Inc. was formed in 2017 when Dow Chemical and DuPont merged to form DowDuPont. In 2019, DowDuPont spun off its agricultural business, including CPP manufacturing, into Defendant Corteva, Inc. During the Relevant Period, Defendant Corteva, Inc. transacted substantial business in the Middle District of North Carolina, including the research, development, manufacture, sale, and marketing of CPPs containing the Relevant AIs.

## III.   Unnamed Co-Conspirators.

22.    Other unknown persons, firms, corporations, and/or other entities not named as Defendants in this Complaint participated as co-conspirators with Defendants and performed acts and made statements in furtherance of Defendants' above-described anticompetitive conduct, including entering into the above-described anticompetitive "loyalty programs." Defendants are jointly and severally liable for the acts of their co-conspirators, regardless of whether Plaintiffs formally name such co-conspirators as Defendants.

## IV.   Reciprocal agency of Defendants and Unnamed Co-Conspirators.

23.    Each Defendant and co-conspirator acted by or through its officers, directors, agents, employees, and/or representatives while actively engaged in the management, direction, control, and/or transaction of the entity's business and/or affairs.

24.    Each Defendant and co-conspirator acted as the agent or joint venturer of the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct Plaintiffs allege.

## INTERSTATE COMMERCE

25.    The market for CPPs in the United States is a national market.

26.    Defendants Corteva and Syngenta sell their CPPs to distributors, which sell them

7

to retailers, which sell them to farmers in all 50 states including Illinois Brick Repealer States defined hereafter.

27. Defendants' manufacture, distribution, and sale of CPPs involves a continuous and uninterrupted flow of commerce across state lines.

28. Defendants' anticompetitive actions have had (and continue to have) a substantial effect on interstate trade and commerce in the markets for the CPPs containing the Relevant AIs.

## THE CPP INDUSTRY BACKGROUND

### I. Introduction.

29. The CPPs containing the Relevant AIs fall into three categories: herbicides, insecticides, and fungicides.

30. Herbicides (also known as weedkillers) are chemicals used to control weeds. Selective herbicides control specific weed species, while leaving the desired crop relatively unharmed. Non-selective herbicides (sometimes called total weedkillers in commercial products), on the other hand, are used to clear waste ground as they kill all plant material with which they come into contact.

31. Insecticides (also known as pesticides) are chemicals used to kill or control various unwanted species of pests that reduce crop yields. Most of the pesticides used in the United States are used by farmers to protect their crops.

32. Fungicides are biocidal chemical compounds or biological organisms used to kill parasitic fungi or their spores. A fungistatic inhibits their growth. Fungi can cause serious damage in agriculture, resulting in critical losses of yield, quality, and profit. Chemicals used to control oomycetes, which are not fungi, are also referred to as fungicides, as oomycetes use the same mechanisms as fungi to infect plants. Fungicides can either be contact, translaminar, or systemic. Contact fungicides are not taken up into the plant tissue and protect only the plant where

8

the spray is deposited. Translaminar fungicides redistribute the fungicide from the upper, sprayed leaf surface to the lower, unsprayed surface. Systemic fungicides are taken up and redistributed through the xylem vessels. Most fungicides are sold in liquid form.

33.     Weeds compete with crops for water and soil nutrients and sunlight.  Pests, such as insects or roundworms (known by the scientific name "nematodes"), eat the plants, and the plants also can be infected by fungi. Any of these crop afflictions can kill or reduce the growth of crops and reduce their yields.

34.     Herbicides, insecticides, and fungicides target these unwanted species to protect crops.  They are known as "Crop Protection Products" (CPPs).

35.     CPPs contain (i) one or more active ingredients—such as the Relevant AIs—which are the chemical(s) that actually eradicate the targeted weeds, pests, or fungi, and (ii) various inactive ingredients, such as water, surfactants (a chemical that helps a liquid spread more easily to increase its effectiveness), or adjuvants (which slow the drying of a liquid or improve its absorption into plant leaves).

36.     AIs differ from one another in various ways: (i) the type of weeds, pests, and fungi they target, (ii) their effectiveness in eliminating or controlling the targeted weeds, pests, and fungi, (iii) the type of crops for which they are used, (iv) the stage of the growing cycle in which they are used, and (v) how well they function under different climatic and weather conditions.

37.     The way in which a specific AI kills or controls unwanted weeds, pests, or fungi is known as a "mode of action." Different AIs have different modes of action in terms of the chemical and biological reactions they use on the targeted weeds, pests, or fungi. For this reason, a generic version of a brand-name CPP that has the same AIs is normally a suitable substitute for the corresponding brand-name CPP.

9

38.     The CPPs at issue here are Syngenta's CPPs containing the Relevant AIs MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR (which term is used herein to refer to both the original METOLACHLOR compound and the subsequent s-METOLACHLOR variant) and their generic equivalents, and Corteva's CPPs containing the Relevant AIs OXAMYL, RIMSULFURON, and ACETOCHLOR and their generic equivalents.

## II.     CPP Manufacturers.

39.     Companies that manufacture CPPs can either manufacture the AIs internally or buy the AIs from chemical suppliers.

40.     Companies that perform their own research and development of AIs for CPPs are known as basic manufacturers. Basic manufacturers secure patent protection for the AIs they develop.

41.     Defendants Syngenta and Corteva are basic manufacturers, and among the largest CPP manufacturers in the United States.

42.     Generic manufacturers of CPPs typically do not engage in their own research and development of AIs. They primarily sell CPPs using AIs developed by basic manufacturers for which the patent and regulatory protections have expired. There are more than twelve generic manufacturers selling CPPs in the United States.

## III.     Government Regulation of CPPs.

43.     The federal government uses regulation and the patent system to encourage CPP manufacturing in two distinct ways: (i) rewarding basic manufacturers, such as Syngenta and Corteva, for researching and developing new CPP AIs by giving them a period of patent and regulatory exclusivity, and (ii) once the protection periods expire, encouraging generic manufacturers to make much cheaper versions of the CPPs. This system allows for a period of large profits for basic manufacturers for researching and developing new brand-name CPP AIs

10

that, in turn, encourages continued innovation, but also makes CPPs affordable once the protection periods expire.

44.     Patent protection for a basic manufacturer developing a new CPP AI lasts from the date of issuance of the patent until twenty years after the date of the patent application.

45.     The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) is a federal regulatory scheme that also rewards innovation while guaranteeing the safety of CPPs. To sell or distribute a CPP in the United States, a manufacturer must conduct research about the CPP's toxicity and environmental impact, and then submit that information to the Environmental Protection Agency (EPA), which reviews that information prior to approving that CPP.

46.     When the EPA approves a new CPP AI, the basic manufacturer that applied for approval of the new AI has a ten-year period under which other companies are not allowed to rely on the studies and data it submitted. The effect of this protection is that the basic manufacturer obtaining the approval has a ten-year exclusive period that can (and often does) last after the expiration of the patent.

47.     After both the patent protection and FIFRA ten-year period protection of an AI have expired, a generic manufacturer may secure approval to enter the market by using the same data the basic manufacturer originally submitted. This is a much faster, easier, and cheaper process than a company performing its own research and development.

## IV.     The CPP Distribution Channel.

48.     CPP manufacturers sell their CPPs to distributors.

49.     CPP distributors sell CPPs to farmers through their own retail outlets and/or sell CPPs to retail chains and independent retailers in farming communities around the country that, in turn, sell the CPPs to farmers.

50.     This "traditional" distribution channel is responsible for approximately 90% of all

11

CPP sales in the United States.

51.     The seven largest U.S. CPP distributors—Nutrien Ag Solutions, Helena Agri-Enterprises, GROWMARK, Inc., Wilbur-Ellis Co., CHS, Pinnacle Agriculture Distribution, and Simplot Grower Solutions—sell approximately 90% of all CPPs sold in the United States through the traditional distribution channel, which equates to about 80% of the total sales of CPPs in the United States annually.

52.     The distributors are by far the best way for a CPP manufacturer to reach their farmer target market.  A CPP manufacturer only must sell through a few large distributors to access a large percentage of all retail outlets serving most American farmers. The distributors either own their own retail stores or have longstanding relationships with retailers that facilitate their CPP sales. Distributors also have a massive infrastructure to support the distribution and sales of their CPPs, including logistics, storage facilities, financing, and promotions. CPP manufacturers would encounter substantial difficulties and significant costs trying to develop these logistical capabilities on their own; it also would be far less efficient for CPP manufacturers to try to sell CPPs directly to retailers or farmers.

V.      **Generic Entry and Life Cycle Management.**

53.     Once the patent and regulatory exclusivity for a basic manufacturer's branded CPP expire, market entry of generic versions of the CPP is normally associated with active competition between many manufacturers, which, in turn, results in far lower prices and vastly reduces the profit the basic manufacturer makes from the CPP.

54.     Basic manufacturers, such as Syngenta and Corteva, engage in corporate strategy planning, known as "life cycle management," for a branded CPP.  This can be done in a perfectly legal and pro-competitive manner, such as determining how a CPP's pricing should change, and how much in promotional expenses should be devoted to that CPP, at different points in its

12

exclusivity period. However, it can also involve anticompetitive methods designed to prevent or delay the entry of generic CPPs into the market—which is precisely what happened with the Relevant AIs here.

## DEFENDANTS' ANTITRUST VIOLATIONS

55. Defendants each use "loyalty programs" with their distributors that are designed to prevent generic competitors from being able to access much of the U.S. CPP market.

56. Defendants' loyalty programs were established with the intention of maintaining monopolistic or near-monopolistic exclusivity for their CPPs even after the patent and regulatory protection on the CPPs expired.

57. Under their loyalty programs, Defendants make large payments to the distributors and retailers and other distributors and retailers that agreed to strictly limit their purchases of certain generic CPPs that compete with Defendants' CPPs that have lost patent and regulatory protection. These large "bonus" payments were a conduit for Defendants to share monopoly profits with such distributors and retailers to secure their cooperation with the anticompetitive scheme described herein.

58. Defendants' loyalty programs, in fact, have achieved these goals. Generic competition for CPPs containing the Relevant AIs has been greatly inhibited due to Defendants' loyalty programs to get distributors and retailers to exclude or minimize the distribution and sale of generic versions of such CPPs.

59. Moreover, the small quantities of CPPs containing generic Relevant AIs that are still able to be sold are significantly more expensive because output is significantly restricted, and prices are artificially higher as a result of Defendants' anticompetitive scheme, as generic manufacturers price their CPPs significantly higher than they otherwise would have priced them in a free, open, and competitive market across the distribution channel.

13

## I. Syngenta's Key AI Loyalty Program.

60. Syngenta's loyalty program is called the "Key AI" program. Both distributors and retailers participate in the Key AI program.

61. The Key AI program is intended to and, in fact, does reduce or exclude generic competition for Syngenta CPPs that have lost patent and regulatory exclusivity.

62. Under the Key AI program, a substantial portion of distributors' and retailers' overall CPP purchases must be Syngenta CPPs that have lost patent and regulatory exclusivity to receive loyalty program payments, thereby severely limiting their purchases of generic versions of such CPPs.

63. As a result of reducing or excluding generic CPP competition, Syngenta continues to charge high prices for its CPPs and maintain high market share even after the CPPs have lost patent and regulatory exclusivity—thereby allowing Syngenta to earn supra-competitive profits that it would not otherwise receive if there was a free, open, and competitive market across the distribution channel.

64. Syngenta uses its loyalty program incentive payments to distributors and retailers to encourage their cooperation in this scheme, sharing part of its supra-competitive profits with them in exchange for their role in reducing or excluding generic CPP competition, so Syngenta's supra-competitive profits will continue.

## II. Corteva's Loyalty Program.

65. Corteva's loyalty program is intended to and, in fact, does reduce or exclude generic competition for Corteva CPPs that have lost patent and regulatory exclusivity.

66. Under Corteva's loyalty program, a substantial portion of distributors' and retailers' overall CPP purchases must be Corteva CPPs that have lost patent and regulatory exclusivity to receive loyalty program payments, thereby severely limiting their purchases of

14

generic versions of such CPPs.

67. As a result of reducing or excluding generic CPP competition, Corteva continues to charge high prices for its CPPs and maintain high market share even after the CPPs have lost patent and regulatory exclusivity—thereby allowing Corteva to earn supra-competitive profits that it would not otherwise receive if there was a free, open, and competitive market across the distribution channel.

68. Corteva uses its loyalty program incentive payments to distributors and retailers to encourage their cooperation in this scheme, sharing part of its supra-competitive profits with them in exchange for their role in reducing or excluding generic CPP competition, so Corteva's supra-competitive profits will continue.

## III. Market Effects of Loyalty Programs.

69. Syngenta and Corteva have entered into loyalty program agreements with all major distributors of CPPs in the United States. Corteva also has entered into loyalty program agreements with major distributors that are also major national retailers of CPPs.

70. Since the major distributors have such a large market share of the traditional distribution channel, and thereby control a large share of all CPP sales to farmers, Syngenta's and Corteva's loyalty programs substantially impact the U.S. CPP market, significantly restricting competition for the CPPs containing the Relevant AIs, which results in higher CPP prices to farmers and extended increased profits for Syngenta and Corteva.

71. The fact that the major distributors know their competitors participate in these loyalty programs means that each major distributor knows that no one distributor will leave a loyalty program and sell lower priced generic CPPs because it would undermine the entire scheme and jeopardize the large profits the distributors generate from the loyalty programs.

72. Since the loyalty programs require the distributors and retailers to purchase a

15

substantial share of their CPPs containing the Relevant AIs from Syngenta and Corteva or risk losing the incentive payments, there is no incentive for the distributors and retailers to deal with generic CPP competitors.

73. Moreover, the small quantities of CPPs containing generic Relevant AIs that are still able to be sold are significantly more expensive because output is significantly restricted, and prices are artificially higher as a result of Defendants' anticompetitive scheme, as generic manufacturers price their CPPs significantly higher than they otherwise would have priced them in a free, open, and competitive market across the distribution channel.

## IV. Syngenta CPPs Subject to the Key AI Loyalty Program.

74. Syngenta's Key AI loyalty program includes CPPs containing three of the Relevant AIs for which patent and regulatory exclusivities have expired: MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR.

75. MESOTRIONE is an herbicide that controls common weeds in corn fields.

76. After Syngenta's patent and regulatory exclusivity for MESOTRIONE expired, generic manufacturers introduced generic versions of CPPs containing MESOTRIONE that were priced significantly lower than Syngenta's branded versions.

77. However, due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for generic CPPs containing MESOTRIONE despite their products having the same AIs and being much cheaper.

78. To meet the Syngenta loyalty program's share requirement and continue to receive large incentive payments, distributors and retailers strictly limit purchases of generic CPPs containing MESOTRIONE (or don't purchase generics), they don't promote generic CPPs containing MESOTRIONE, and they encourage their customers to buy Syngenta's CPPs containing MESOTRIONE rather than equally effective generic competitors.

16

79. This has effectively minimized generic competition for Syngenta in the market for CPPs containing MESOTRIONE and caused at least two generic manufacturers to postpone or cancel introducing a MESOTRIONE CPP in the United States.

80. This greatly reduced competition has resulted in much higher profits for Syngenta from sales of brand-name CPPs containing MESOTRIONE than it would have otherwise received in a free, open, and competitive market across the distribution channel.

81. AZOXYSTROBIN is a fungicide used to kill and control fungal diseases on crops.

82. After Syngenta's patent and regulatory exclusivity for AZOXYSTROBIN expired, generic manufacturers introduced generic versions of CPPs containing AZOXYSTROBIN that were priced significantly lower than Syngenta's branded versions.

83. However, due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for generic CPPs containing AZOXYSTROBIN despite their products having the same AIs and being much cheaper.

84. To meet the Syngenta loyalty program's share requirement and continue to receive large incentive payments, distributors and retailers strictly limit purchases of generic CPPs containing AZOXYSTROBIN (or don't purchase generics at all), they don't promote generic CPPs containing AZOXYSTROBIN, and they encourage their customers to buy Syngenta's CPPs containing AZOXYSTROBIN rather than equally effective generic competitors.

85. This has effectively minimized generic competition for Syngenta in the market for CPPs containing AZOXYSTROBIN and caused at least two generic manufacturers to postpone or cancel introducing a AZOXYSTROBIN CPP in the United States.

86. This greatly reduced competition has resulted in much higher profits for Syngenta from sales of brand-name CPPs containing AZOXYSTROBIN than it would have otherwise

Case 1:23-cv-00267-JEP   Document 1   Filed 03/29/23   Page 17 of 96

received in a free, open, and competitive market across the distribution channel.

87.     METOLACHLOR is an herbicide that controls common weeds in various crop fields, including corn, soybeans, and sorghum.

88.     After Syngenta's patent and regulatory exclusivity for METOLACHLOR (and s-METOLACHLOR, a variant of the original compound developed by a Syngenta predecessor company) expired, generic manufacturers introduced generic versions of CPPs containing METOLACHLOR that were priced significantly lower than Syngenta's branded versions.

89.     However, due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for generic CPPs containing METOLACHLOR despite their products having the same AIs and being much cheaper.

90.     To meet the Syngenta loyalty program's share requirement and continue to receive large incentive payments, distributors and retailers strictly limit purchases of generic CPPs containing METOLACHLOR (or don't purchase generics at all), they don't promote generic CPPs containing METOLACHLOR, and they encourage their customers to buy Syngenta's CPPs containing METOLACHLOR rather than equally effective generic competitors.

91.     This has effectively minimized generic competition for Syngenta in the market for CPPs containing METOLACHLOR and caused at least two generic manufacturers to postpone or cancel introducing a METOLACHLOR CPP in the United States.

92.     This greatly reduced competition has resulted in much higher profits for Syngenta from sales of brand-name CPPs containing METOLACHLOR than it would have otherwise received in a free, open, and competitive market across the distribution channel.

93.     Distributors and retailers have received (and continue to receive) loyalty program payments from Syngenta for cooperating with Syngenta's above-described scheme to restrain trade

in its Relevant AIs and generated substantial illicit profits doing so.

## V. Corteva CPPs Subject to Corteva's Loyalty Program.

94. Corteva's loyalty program includes CPPs containing three of the Relevant AIs for which patent and regulatory exclusivities have expired: OXAMYL, RIMSULFURON, and ACETOCHLOR.

95. OXAMYL is an insecticide and nematicide used to control pests in various crop fields, including cotton fields and fruit and vegetable fields.

96. After Corteva's patent and regulatory exclusivity for OXAMYL expired, generic manufacturers introduced generic versions of CPPs containing OXAMYL that were priced significantly lower than Corteva's branded versions.

97. However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for generic CPPs containing OXAMYL despite their products having the same AIs and being much cheaper.

98. To meet the Corteva loyalty program's share requirement and continue to receive large incentive payments, distributors and retailers strictly limit purchases of generic CPPs containing OXAMYL (or don't purchase generics at all), they don't promote generic CPPs containing OXAMYL, and they encourage their customers to buy Corteva's CPPs containing OXAMYL rather than equally effective generic competitors.

99. This has effectively minimized generic competition for Corteva in the market for CPPs containing OXAMYL and caused at least two generic manufacturers to postpone or cancel introducing an OXAMYL CPP in the United States.

100. This greatly reduced competition has resulted in much higher profits for Corteva from sales of brand-name CPPs containing OXAMYL than it would have otherwise received in a free, open, and competitive market across the distribution channel.

19

101.    RIMSULFURON is an herbicide used to hinder weed growth in various crop fields.

102.    After Corteva's patent and regulatory exclusivity for RIMSULFURON expired, generic manufacturers introduced generic versions of CPPs containing RIMSULFURON that were priced significantly lower than Corteva's branded versions.

103.    However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for generic CPPs containing RIMSULFURON despite their products having the same AIs and being much cheaper.

104.    To meet the Corteva loyalty program's share requirement and continue to receive large incentive payments, distributors and retailers strictly limit purchases of generic CPPs containing RIMSULFURON (or don't purchase generics at all), they don't promote generic CPPs containing RIMSULFURON, and they encourage their customers to buy Corteva's CPPs containing RIMSULFURON rather than equally effective generic competitors.

105.    This has effectively minimized generic competition for Corteva in the market for CPPs containing RIMSULFURON and caused at least two generic manufacturers to postpone or cancel introducing a RIMSULFURON CPP in the United States.

106.    This greatly reduced competition has resulted in much higher profits for Corteva from sales of brand-name CPPs containing RIMSULFURON than it would have otherwise received in a free, open, and competitive market across the distribution channel.

107.    ACETOCHLOR is an herbicide that inhibits weed growth in corn, soybean, and sugar beet fields.

108.    Corteva and Bayer are joint venture partners that own the U.S. registration for ACETOCHLOR. Bayer manufactures the ACETOCHLOR and Corteva sells CPPs containing ACETOCHLOR covered by the Corteva loyalty program.

109.    After Corteva's patent and regulatory exclusivity for ACETOCHLOR expired, generic manufacturers introduced generic versions of CPPs containing ACETOCHLOR that were priced significantly lower than Corteva's branded versions.

110.    However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for generic CPPs containing ACETOCHLOR despite their products having the same AIs and being much cheaper.

111.    To meet the Corteva loyalty program's share requirement and continue to receive large incentive payments, distributors and retailers strictly limit purchases of generic CPPs containing ACETOCHLOR (or don't purchase generics at all), they don't promote generic CPPs containing ACETOCHLOR, and they encourage their customers to buy Corteva's CPPs containing ACETOCHLOR rather than equally effective generic competitors.

112.    This has effectively minimized generic competition for Corteva in the market for CPPs containing ACETOCHLOR and caused at least two generic manufacturers to postpone or cancel introducing an ACETOCHLOR CPP in the United States.

113.    This greatly reduced competition has resulted in much higher profits for Corteva from sales of brand-name CPPs containing ACETOCHLOR than it would have otherwise received in a free, open, and competitive market across the distribution channel.

114.    Distributors and retailers have received (and continue to receive) loyalty program payments from Corteva for cooperating with Corteva's above-described scheme to restrain trade in its Relevant AIs and generated substantial illicit profits doing so.

## RELEVANT MARKETS

115.    At all relevant times, Syngenta had (and has) market and monopoly power with respect to CPPs containing AZOXYSTROBIN, MESOTRIONE, and METOLACHLOR. Syngenta had (and has) the power to maintain the prices of CPPs containing these Relevant AIs at supra-

21

competitive levels without losing substantial sales to other CPPs used for the same purposes.

116.    At all relevant times, Corteva had (and has) market and monopoly power in the markets for CPPs containing OXAMYL and RIMSULFURON and had (and has) market power with respect to CPPs containing ACETOCHLOR. Corteva had (and has) the power to maintain the prices of CPPs containing these Relevant AIs at supra-competitive levels without losing substantial sales to other CPPs used for the same purposes.

117.    To the extent Plaintiffs' claims require the definition of a relevant market, it is the market for EPA-registered CPPs for sale in the United States containing the Relevant AIs, as follows:

    a.    For the Relevant AI AZOXYSTROBIN, the relevant market is the market for EPA-registered CPPs for sale in the United States containing AZOXYSTROBIN, including Syngenta's CPPs containing AZOXYSTROBIN and any generic versions of such CPPs;

    b.    For the Relevant AI MESOTRIONE, the relevant market is the market for EPA-registered CPPs for sale in the United States containing MESOTRIONE, including Syngenta's CPPs containing MESOTRIONE and any generic versions of such CPPs;

    c.    For the Relevant AI METOLACHLOR, the relevant market is the market for EPA-registered CPPs for sale in the United States containing METOLACHLOR, including Syngenta's CPPs containing METOLACHLOR and any generic versions of such CPPs; and

    d.    For the Relevant AI OXAMYL, the relevant market is the market for EPA-registered CPPs for sale in the United States containing OXAMYL, including

Corteva's CPPs containing OXAMYL and any generic versions of such CPPs;

e.  For the Relevant AI RIMSULFURON, the relevant market is the market for EPA-registered CPPs for sale in the United States containing RIMSULFURON, including Corteva's CPPs containing s RIMSULFURON and any generic versions of such CPPs; and

f.  For the Relevant AI s ACETOCHLOR, the relevant market is the market for EPA-registered CPPs for sale in the United States containing ACETOCHLOR, including Corteva's CPPs containing ACETOCHLOR and any generic versions of such CPPs;

118.  To the extent Plaintiffs' claims require the definition of a relevant geographic market, it is the United States. The EPA must approve CPPs for sale and use in the United States. Farmers in the United States are not allowed to legally use CPPs from other countries that have not been approved for sale and use in the United States. Thus, the price of CPPs in other countries does not affect the market for CPPs in the United States.

119.  Defendants dominate the markets for CPPs containing the Relevant AIs despite the fact that such CPPs do not currently possess patent and regulatory exclusivities. Defendants' wrongful actions also created barriers to entry for generic manufacturers of CPPs containing the Relevant AIs that prevent them from accessing the traditional distribution channels and competing effectively in such markets.

120.  For each CPP containing a Relevant AI, its only reasonable substitute is a generic version of the CPP containing a generic version of the Relevant AI. Other CPPs with different AIs will attack different types of weeds or pests, be suitable for different climate and weather conditions or types of crops, and/or have different modes of action in terms of the chemical and

biological reactions used to target particular weeds or pests and, therefore, would obtain different results than a CPP containing a Relevant AI.

121.    MESOTRIONE is differentiated from other CPP AIs used for similar purposes due to its greater efficacy and crop safety and lower use rate than other CPPs.

122.    AZOXYSTROBIN is differentiated from other CPP AIs used for similar purposes because it can be used with all major row crops, making application easier. It also is claimed to have growth-promoting effects on crops.

123.    METOLACHLOR is differentiated from other CPP AIs used for similar purposes due to its greater solubility in water (which improves its performance in drier conditions), better performance in warmer conditions, and ability to be used in a wider variety of crop fields. S-METOLACHLOR has the same advantages of METOLACHLOR but with an even greater efficacy in killing weeds.

124.    OXAMYL is differentiated from other CPP AIs used for similar purposes because it has less risk to crops and/or soil health and can be applied directly onto crops instead of applied at root level or in the soil.

125.    RIMSULFURON is differentiated from other CPP AIs used for similar purposes because it affects more different types of weeds, it can be used with a wider variety of crop fields, and it can be used preemptively to prevent weed growth as well controlling an existing weed problem.

126.    ACETOCHLOR is differentiated from other CPP AIs used for similar purposes due to its superior performance in wetter or cooler conditions, its greater efficacy against particular types of weeds, and its greater efficacy earlier in the growing season.

127.    A small but significant and non-transitory artificial inflation of the price of any

CPPs containing the Relevant AIs would not cause a significant number of consumers to purchase CPPs with different AIs so as to make such price inflation unprofitable. A small but significant and non-transitory artificial inflation of the price of any CPPs with different AIs than the Relevant AIs would not cause a significant number of farmers to purchase CPPs containing the Relevant AIs instead so as to make such artificial price inflation unprofitable.

## EFFECTS OF DEFENDANTS' ANTITRUST VIOLATIONS

128.    Syngenta's and Corteva's CPP loyalty programs, with cooperation and assistance of distributors and retailers, were intended to and, in fact, did exclude and/or reduce generic competition for the manufacture and sale of CPPs containing the Relevant AIs in the United States.

129.    As such, Plaintiffs and members of the Classes paid (and continue to pay) more for brand-name CPPs containing the Relevant AIs, as well as their generic CPP competitors, than what they would have paid in a free, open, and competitive market across the distribution channel. Plaintiffs and members of the Classes have sustained (and continue to sustain) substantial losses and damage to their businesses and property in the form of the overcharges on such purchases of CPPs containing the Relevant AIs, as well as their generic CPP competitors. The types and amounts of their antitrust damages will be determined after discovery and upon proof at trial. Plaintiffs' and members of the Classes' antitrust damages, injury, and harm, which are the foreseeable, direct, an/or proximate result of Defendants' anticompetitive conduct are ongoing.

## CLASS ACTION ALLEGATIONS

130.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking injunctive relief pursuant to federal law, and damages pursuant to the antitrust, consumer protection, or unfair trade practices statutes of each of those jurisdictions where applicable (the "**Illinois Brick Repealer States**"), and under common law principles of unjust enrichment where recognized in such jurisdictions, on

25

behalf of the members of the following classes (collectively, the "**Classes**"):

A) <u>**Nationwide Injunctive Relief class:**</u> All persons or entities in the United States that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

B) <u>**Arizona class:**</u> All persons or entities in Arizona that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

C) <u>**Arkansas class:**</u> All persons or entities in Arkansas that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

D) <u>**California class:**</u> All persons or entities in California that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

26

E) **District of Columbia class:**  All persons or entities in the District of Columbia that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

F) **Florida class:**  All persons or entities in Florida that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

G) **Guam class:**  All persons or entities in Guam that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

H) **Hawaii class:**  All persons or entities in Hawaii that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

I) **Illinois class:**  All persons or entities in Illinois that indirectly purchased CPPs

27

containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

J) **Iowa class:** All persons or entities in Iowa that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

K) **Kansas class:** All persons or entities in Kansas that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

L) **Maine class:** All persons or entities in Maine that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

M) **Massachusetts class:** All persons or entities in Massachusetts that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN,

28

METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

N) **<u>Michigan class:</u>** All persons or entities in Michigan that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

O) **<u>Minnesota class:</u>** All persons or entities in Minnesota that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

P) **<u>Mississippi class:</u>** All persons or entities in Mississippi that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

Q) **<u>Missouri class:</u>** All persons or entities in Missouri that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the

29

Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

R) **<u>Nebraska class:</u>** All persons or entities in Nebraska that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

S) **<u>Nevada class:</u>** All persons or entities in Nevada that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

T) **<u>New Hampshire class:</u>** All persons or entities in New Hampshire that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

U) **<u>New Mexico class:</u>** All persons or entities in New Mexico that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not

for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

V) **New York class:** All persons or entities in New York that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

W) **North Carolina class:** All persons or entities in North Carolina that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

X) **North Dakota class:** All persons or entities in North Dakota that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

Y) **Oregon class:** All persons or entities in Oregon that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of

31

Defendants' conduct herein ceases.

Z) **<u>Rhode Island class:</u>** All persons or entities in Rhode Island that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

AA) **<u>South Carolina class:</u>** All persons or entities in South Carolina that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

BB) **<u>South Dakota class:</u>** All persons or entities in South Dakota that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

CC) **<u>Tennessee class:</u>** All persons or entities in Tennessee that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

32

DD) **Utah class:** All persons or entities in Utah that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

EE) **Vermont class:** All persons or entities in Vermont that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

FF) **Virginia class:** All persons or entities in Virginia that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

GG) **West Virginia class:** All persons or entities in West Virginia that indirectly purchased CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

HH) **Wisconsin class:** All persons or entities in Wisconsin that indirectly purchased

33

CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR that were manufactured by one or more of the Defendants or Defendants' generic competitors, for their own use and not for resale, from as early as January 1, 2017, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

131. Excluded from the Classes are (i) Defendants and their subsidiaries, affiliates, directors, officers, and employees, and (ii) all state and federal government entities and agencies, including the Court and Court personnel.

132. Each of the Classes is individually so numerous that joinder of all members is impracticable. Even though the exact number of members of each of the Classes is unknown at this time, based on the nature of the trade and commerce involved, Plaintiffs reasonably believe that there are at least thousands of members in each of the Classes and that their identities can be readily ascertained from records in the possession of Defendants and third parties.

133. By their above-described anticompetitive conduct and wrongful actions, Defendants violated the rights of Plaintiffs and each member of the Classes in the same way by overcharging for CPPs containing the Relevant AIs, as well as their generic competing CPPs, that, in turn, resulted in the infliction of antitrust injury, harm, and damages on Plaintiffs' and each member of the Classes' businesses and property.

134. Certain questions of law and fact common to the proposed Classes predominate over any questions affecting individual member of the Classes, including, *inter alia*:

(i) Whether Syngenta had anticompetitive monopoly power in the markets for CPPs containing MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR by means of its CPP loyalty program?

(ii) Whether Syngenta's CPP loyalty program was intended to and/or did, in fact, exclude or reduce generic competition for CPPs containing MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR?

34

(iii)    Whether Corteva had anticompetitive monopoly power in the markets for CPPs containing OXAMYL, RIMSULFURON, and/or ACETOCHLOR by means of its CPP loyalty program?

(iv)    Whether Corteva's CPP loyalty program was intended to and/or did, in fact, exclude or reduce generic competition for CPPs containing OXAMYL, RIMSULFURON, and ACETOCHLOR?

(v)    Whether Syngenta's alleged anticompetitive conduct violated (and continues to violate) Section 1 of the Sherman Act, 15 U.S.C. § 1?

(vi)    Whether Corteva's alleged anticompetitive conduct violated (and continues to violate) Section 1 of the Sherman Act, 15 U.S.C. § 1?

(vii)    Whether Syngenta's alleged anticompetitive conduct violated (and continues to violate) Section 2 of the Sherman Act, 15 U.S.C. § 2?

(viii)    Whether Corteva's alleged anticompetitive conduct violated (and continues to violate) Section 2 of the Sherman Act, 15 U.S.C. § 2?

(ix)    Whether Syngenta's alleged conduct violated various state antitrust and restraint of trade laws?

(x)    Whether Corteva's alleged conduct violated various state antitrust and restraint of trade laws?

(xi)    Whether Syngenta's alleged conduct violated various state consumer protection and unfair competition laws?

(xii)    Whether Corteva's alleged conduct violated various state consumer protection and unfair competition laws?

(xiii)    Whether Syngenta's alleged anticompetitive conduct was (and continues to be) an unreasonable restraint of trade?

(xiv)    Whether Corteva's alleged anticompetitive conduct was (and continues to be) an unreasonable restraint of trade?

(xv)    Whether Syngenta's and Corteva's alleged anticompetitive conduct directly and/or proximately caused Plaintiffs' and Class Members' antitrust injury, harm, and damages to their businesses and property?

(xvi)    Whether Plaintiffs and Class members are entitled to injunctive and/or equitable relief and, if so, the form of such relief?

(xvii)    Whether Syngenta and Corteva fraudulently concealed their alleged anticompetitive conduct?

35

(xviii) Whether Plaintiffs and Class members could reasonably have known about Syngenta's and Corteva's alleged anticompetitive conduct prior to the Federal Trade Commission filing its complaint in September 2022?

135.     Plaintiffs' claims are typical of the claims of the members of the Classes because Plaintiffs and the members of the Classes are all victims of the same above-described anticompetitive schemes involving CPPs containing the Relevant AIs perpetrated on them by Syngenta and Corteva.

136.     Plaintiffs and their counsel will fairly and adequately represent the interests of the members of the Classes. Plaintiffs have no interests antagonistic to, or in conflict with, the interests of any of the members of the Classes. Plaintiffs' counsel are experienced in leading and prosecuting large multi-district antitrust class actions, and do not anticipate any difficulties in managing this action as a class action.

137.     A class action is superior to all other available methods for fairly and efficiently adjudicating Plaintiffs' and Class Members' claims. Plaintiffs and Class Members have been (and will continue to be) harmed, injured, and damaged as a direct and/or proximate result of Syngenta's and Corteva's alleged anticompetitive conduct. Litigating this case as a class action is appropriate because (i) it will avoid a multiplicity of suits and the corresponding burden on the courts and Parties, (ii) it would be virtually impossible for all Class Members to intervene as individual parties-Plaintiffs in this action, and (iii) it will provide court oversight of the claims process once Defendants' liability is adjudicated.

138.     Certification, therefore, is appropriate under FED. R. CIV. P. 23(b)(3) because the above-described common questions of law or fact predominate over any questions affecting individual Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

139.     Certification also is appropriate under FED. R. CIV. P. 23(b)(2) because Defendants

36

have acted (or refused to act) on grounds generally applicable to the Classes, thereby making equitable relief appropriate for the Classes as a whole.

140.　　Certification also is appropriate under FED. R. CIV. P. 23(b)(1) because the prosecution of separate actions by individual Class Members would create a risk of establishing incompatible standards of conduct for Defendants. For example, individual actions could be dispositive of the interests of other Class Members who are not parties to such actions, and substantially impair or impede their ability to protect their interests.

141.　　Syngenta's and Corteva's alleged anticompetitive conduct are applicable to the Classes as a whole, for which Plaintiffs seek, *inter alia*, damages and other equitable remedies.

142.　　Absent a class action, Syngenta and Corteva will retain the benefits of their wrongdoing despite seriously violating the law and inflicting actual and consequential antitrust injury, harm, and damages on Plaintiffs and Class Members and their property and businesses.

## DEFENDANTS' FRAUDULENT CONCEALMENT OF THE CPP LOYALTY PROGRAM SCHEME

143.　　Defendants effectively, affirmatively, and fraudulently concealed their CPP loyalty program scheme from Plaintiffs and Class members. Plaintiffs and members of the Classes do not specialize in the manufacturing, marketing, and sales of CPPs, but rather, they are farmers. Along with hundreds of other agricultural products, they purchase CPPs indirectly from Defendants and apply them to their crops and fields.

144.　　Defendants used various means and methods to fraudulently conceal their CPP loyalty program scheme from Plaintiffs and Class members, including, without limitation, (i) entering into private CPP loyalty program agreements that were not publicly disclosed to Plaintiffs and members of the Classes or disclosed in legally mandated public disclosure documents, such as Syngenta's and Corteva's SEC filings, (ii) secret meetings, (iii) surreptitious communications

between Defendants and distributors and retailers by telephone or in person meetings to prevent the existence of written records, and (iv) statements to Plaintiffs and members of the Classes designed to deceive Plaintiffs about the real factors involved in the prices that Plaintiffs paid for CPPs containing the Relevant AIs, as well as their generic CPP counterparts.

145. Defendants engaged in secret behavior intended to advance their CPP loyalty program scheme for the purpose of reaping substantially higher profits on such CPPs over an extended time than they otherwise would have generated in a free, open, and competitive market. Defendants' CPP loyalty program and scheme—based on behavior known only by them to be illegal at the time they engaged in such behavior—plausibly suggest they engaged in a campaign of fraudulent concealment.

146. In addition to Defendants affirmatively concealing their CPP loyalty program scheme, the scheme was inherently self-concealing because it depended on secrecy for its successful operation.

147. Until the Federal Trade Commission ("**FTC**") and various states filed their complaint in federal court in the Middle District of North Carolina on September 29, 2022 (the "**FTC Complaint**"), Plaintiffs and members of the Classes had neither actual, nor constructive, knowledge of the facts constituting their claims for relief as stated in this Complaint. Plaintiffs and members of the Classes did not discover, and could not have discovered, through the exercise of reasonable diligence, the existence of the CPP loyalty program scheme alleged herein until the FTC filed its complaint. Until then, Defendants engaged in their secret CPP loyalty program scheme that did not reveal facts that would put Plaintiffs and members of the Classes on inquiry notice that that such a scheme existed. Throughout the Relevant Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful CPP loyalty program scheme from

38

Plaintiffs and members of the Classes.

148.     Plaintiffs and members of the Classes also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred. Reasonable diligence by Plaintiffs and members of the Classes would not have uncovered those facts more than four years before the filing of this Complaint.

149.     All applicable statutes of limitations affecting Plaintiffs and members of the Classes' claims, therefore, have been tolled. As such, Plaintiffs and members of the Classes are entitled to recover damages reaching back beyond four years of the filing of this Complaint.

## DEFENDANTS' ONGOING AND CONTINUING ANTITRUST VIOLATIONS

150.     A continuing violation operates in two ways: (i) it restarts the statute of limitations period each time Defendants commit an overt act, and (ii) it occurs where, as here, Defendants' anticompetitive conduct causes a continuing harm to Plaintiffs and members of the Classes.

### I.     Defendants Renewed their CPP Loyalty Program Scheme with New and Independent Acts.

151.     From the start of their CPP loyalty program scheme, at least as early as the beginning of 2017, and continuing through the effects of the CPP loyalty program scheme, Defendants or distributors and retailers sold CPPs containing the Relevant AIs, as well as their generic CPP competitors, to purchasers, such as Plaintiffs and members of the Classes, at artificially high prices resulting from Defendants' CPP loyalty program agreements. A cause of action accrued for Plaintiffs and Class members each time they bought CPPs containing the AIs CPPs or their generic CPP competitors covered by Defendants' loyalty program agreements at supra-competitive prices, which constituted another overt act in furtherance of their anticompetitive CPP loyalty program scheme. Accordingly, even though certain of the loyalty program agreements were entered into more than four years prior to the filing of this Complaint,

39

Plaintiffs and members of the Classes are entitled to recover damages on all their purchases at supra-competitive prices of CPPs containing the Relevant AIs, as well as their generic CPP competitors, within, at the very least, four years of the filing of this Complaint.

152. Defendants' conspiratorial meetings, communications, and nondisclosures were among the overt acts that commenced running a new statute of limitations because such meetings, communications, and nondisclosures advanced the objectives of their CPP loyalty program scheme. Defendants also committed new overt acts each time they took actions to implement their CPP loyalty program scheme, such as by entering into loyalty program agreements and selling CPPs containing the Relevant AIs, as well as their generic CPP competitors, to Plaintiffs and members of the Classes at supra-competitive prices.

153. Each sale of CPPs containing the Relevant AIs, as well as their generic CPP competitors, by Defendants and/or distributors and retailers to Plaintiffs and members of the Classes at a supra-competitive price also was a new overt act and antitrust violation injuring Plaintiffs and members of the Classes that started the statutory period running again.

154. Defendants' overt acts, including, without limitation, those mentioned above, were new and independent acts that perpetuated their loyalty program agreements; they were not merely reaffirmations of Defendants' previous acts. By constantly selling CPPs containing the Relevant AIs, as well as their generic CPP competitors, to Plaintiffs and members of the Classes at supra-competitive prices Defendants inflicted new and accumulating injury, harm, and damages on Plaintiffs' and members of the Classes' businesses and property.

## II. Defendants Inflicted New and Accumulating Injury on Plaintiffs and Members of the Classes.

155. Plaintiffs and members of the Classes purchased CPPs containing the Relevant AIs, as well as their generic CPP competitors indirectly from Defendants, from the beginning of the

CPP loyalty program scheme until the present and will continue to do so in the future.

156.     Each such purchase by Plaintiffs and members of the Classes at a price that was higher, or will be higher in the future, resulting from Defendants' CPP loyalty program scheme necessarily caused Plaintiffs to suffer new and accumulating injury, harm, and damages.

157.     As the concept of a continuing violation applies to a scheme that brings about a series of unlawfully high-priced sales over several years, each sale of CPPs containing the Relevant AIs, as well as their generic CPP competitors to Plaintiffs and members of the Classes by Defendants or their distributors or retailers starts the statutory period running again, regardless of Plaintiffs' and/or members of the Classes' knowledge about the unlawful CPP loyalty program scheme at an earlier time. This means that each illegally priced sale of CPPs containing the Relevant AIs, as well as their generic CPP competitors, to Plaintiffs and members of the Classes created a new cause of action for purposes of the statute of limitations.

158.     Defendants' CPP loyalty program scheme continued into the period four years before the FTC Complaint was filed, and into the period four years before the filing of the first indirect purchaser class action complaint.

159.     Defendants and their distributors and retailers constantly coordinated and communicated with each other beginning in 2017 and through the present. Including in this manner, Defendants' CPP loyalty program scheme continued when their CPP sales to Plaintiffs and members of the Classes were made during the period four years preceding the filing of the FTC Complaint, and during the period four years preceding the filing of the first indirect purchaser class action complaint.

160.     Defendants' CPP loyalty program scheme was intended to and, in fact, did inflict continuing injury, harm, and damages on Plaintiffs' and Class members' businesses and property.

41

# CLAIMS AND CAUSES OF ACTION

## COUNT ONE

## VIOLATION OF § 1 OF THE SHERMAN ACT (15 U.S.C. § 1)
### (Against All Defendants)
### Injunctive Relief Only

161. The preceding factual statements and allegations are incorporated by reference.

162. Defendants Corteva and Syngenta violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by entering into unlawful loyalty program agreements with distributors and retailers that were intended to and did, in fact, restrain generic competition in the markets for CPPs containing the Relevant AIs.

163. Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, injured, harmed, and damaged Plaintiffs and the Nationwide Injunctive Relief Class in their businesses or property. Plaintiffs' and the Nationwide Injunctive Relief Class's damages consist of paying higher prices for CPPs containing the Relevant AIs and their generic competitor CPPs than they otherwise would have paid in a free, open, and competitive market across the distribution channels. Such injury, harm, and damages, also known as "overcharges," are of the type that the antitrust laws are designed to prevent, and it flows from Defendants' alleged anticompetitive and unlawful conduct.

164. At all relevant times, Defendants possessed market power in the relevant markets for each of the CPPs containing the Relevant AIs. But for Defendants' wrongful conduct, as alleged herein, genuine competition from generic manufacturers for each of such CPPs would have greatly reduced retail prices at all points across the distribution channel, including the prices paid by Plaintiffs and Class members.

165. Defendants entered into the CPP loyalty program agreements with distributors and retailers under which Defendants made large payments to their distributors and retailers in exchange

42

for such distributors and retailers minimizing their purchases and sales of generic CPP competitors of the brand-name CPPs containing the Relevant AIs manufactured by Defendants. Defendants entered into the CPP loyalty program agreements to and, in fact, did unreasonably restrain trade in the markets for such CPPs, the purpose and effect of which was to: (i) prevent generic competitors for the CPPs containing the Relevant AIs from accessing large parts of the market, and (ii) allow their own name-brand CPPs containing the Relevant AIs to be sold at significantly higher prices and still maintain most of the market, thereby artificially increasing the prices that Plaintiffs and members of the Nationwide Injunctive Relief Class paid for such CPPs. Defendants also used the loyalty programs to divert a portion of their supra-competitive profits from their scheme to their distributors and retailers to secure their cooperation with the scheme.

166. There is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' anticompetitive conduct that outweighs its harmful effect on CPP purchasers and competition. Defendants' conduct can only be explained by anticompetitive motives and a desire to foreclose competition in the markets for CPPs containing the Relevant AIs. Even if there were some conceivable and cognizable justification, Defendants' CPP loyalty program agreements were not necessary to achieve such a purpose. Any supposed procompetitive benefits are false and pretextual and/or could have been achieved in a less restrictive manner.

167. Moreover, the small quantities of the generic competitor CPPs that are still sold are significantly more expensive because output in their markets is significantly restricted, thereby empowering generic manufacturers to price such generic CPPs significantly higher than they would be prices in a free, open, and competitive market across the distribution channel.

168. As a direct and/or proximate result of Defendants' anticompetitive conduct involving the CPP loyalty program agreements, Plaintiffs and members of the Nationwide

43

Injunctive Relief Class have been (and will continue to be) harmed.

169. As a direct, material, and/or proximate result of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Plaintiffs and members of the Nationwide Injunctive Relief Class have suffered (and will continue to suffer) injury and harm to their businesses or property.

170. Defendants' unlawful anticompetitive conduct continues and, unless restrained, will continue. Unless and until their wrongful conduct is enjoined, Plaintiffs and members of the Nationwide Injunctive Relief Class will continue to suffer immediate and irreparable injury for which they are without an adequate remedy at law. Plaintiffs and members of the Nationwide Injunctive Relief Class, therefore, are entitled to an injunction against Defendants preventing and restraining further antitrust violations, under Section 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNT TWO

## <u>VIOLATION OF § 2 OF THE SHERMAN ACT (15 U.S.C. § 2) – MONOPOLIZATION</u>
### (Against Syngenta)
### Injunctive Relief Only

171. The preceding factual statements and allegations are incorporated by reference.

172. The relevant product markets are the markets for EPA-registered CPPs containing MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR. The relevant geographic market is the United States.

173. As a result of the scheme alleged herein, Syngenta possesses market and monopoly power in each of these markets.

174. By means of the CPP loyalty program scheme, under which it made large payments to its distributors and retailers for their above-described cooperation, Syngenta willfully maintained its monopoly power in such markets even after its patent and regulatory exclusivities expired.

44

175. Syngenta's actions were carried out willfully and with the specific intent to maintain its monopoly power in such CPP markets through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

176. The direct, foreseeable, and proximate result of Syngenta's anticompetitive conduct was increased prices and harm to competition in such CPP markets.

177. There is no legitimate pro-competitive justification for Syngenta's anticompetitive conduct, and even if there were, there are less restrictive alternatives to achieve them.

178. As a direct, material, and proximate result of Syngenta's violation of § 2 of the Sherman Act, Plaintiffs and members of the Nationwide Injunctive Relief Class have suffered (and will continue to suffer) injury and harm to their businesses and property.

179. Syngenta's unlawful anticompetitive conduct continues and, unless restrained, will continue. Unless and until its wrongful conduct is enjoined, Plaintiffs and members of the Nationwide Injunctive Relief Class will continue to suffer immediate and irreparable injury for which they are without an adequate remedy at law. Plaintiffs and members of the Nationwide Injunctive Relief Class, therefore, are also entitled to an injunction against Syngenta preventing and restraining further antitrust violations, under § 16 of the Clayton Act.

**COUNT THREE**

**<u>VIOLATION OF § 2 OF THE SHERMAN ACT (15 U.S.C. § 2) – MONOPOLIZATION</u>**
**(Against Corteva)**
**Injunctive Relief Only**

180. The preceding factual statements and allegations are incorporated by reference.

181. The relevant product markets are the markets for EPA-registered CPPs containing RIMSULFURON and OXAMYL. The relevant geographic market is the United States.

182. As a direct and/or proximate result of the alleged CPP loyalty program scheme, Corteva possesses monopoly power in the markets for EPP-registered CPPs containing

45

RIMSULFURON and OXAMYL for sale in the United States.

183.  By means of the CPP loyalty program scheme, under which it made large payments to its distributors and retailers for their above-described cooperation, Corteva willfully maintained its monopoly power in such markets even after its patent and regulatory exclusivities expired.

184.  Corteva's actions were carried out willfully and with the specific intent to maintain its monopoly power in such CPP markets through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

185.  The direct, foreseeable, and proximate result of Corteva's anticompetitive conduct was increased prices and harm to competition in such CPP markets.

186.  There is no legitimate pro-competitive justification for Corteva's anticompetitive conduct, and even if there were, there are less restrictive alternatives to achieve them.

187.  As a direct, material, and proximate result of Corteva's violation of § 2 of the Sherman Act, Plaintiffs and members of the Nationwide Injunctive Relief Class have suffered (and will continue to suffer) injury and harm to their businesses and.

188.  Corteva's unlawful anticompetitive conduct continues and, unless restrained, will continue. Unless and until its wrongful conduct is enjoined, Plaintiffs and members of the Nationwide Injunctive Relief Class will continue to suffer immediate and irreparable injury for which they are without an adequate remedy at law. Plaintiffs and members of the Nationwide Injunctive Relief Class, therefore, are entitled to an injunction against Corteva preventing and restraining further antitrust violations, under § 16 of the Clayton Act.

**VIOLATIONS OF STATE ANTITRUST AND UNFAIR COMPETITION LAWS**

189.  The preceding factual statements and allegations are incorporated by reference.

190.  Defendants' anticompetitive conduct violated the state antitrust and unfair

46

competition laws of the states listed below, causing direct and proximate harm to the money, business, or property of the members of the Classes for the states listed below.

## COUNT FOUR

### Violation of Arizona's Uniform State Antitrust Act (Ariz. Rev. Stat. §§ 44-1401, *et seq.*)
### (Against All Defendants)

191.    By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. §§ 44-1401, *et seq.*

192.    Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within Arizona.

193.    Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant markets.

194.    Defendants' violations of Arizona law were flagrant.

195.    Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

196.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Arizona Class have been injured in their business or property and are threatened with further injury.

197.    By reason of the foregoing, the Arizona Class is entitled to seek all forms of relief available under Arizona Revised Stat. §§ 44-1401, *et seq.*

47

## COUNT FIVE

## Violation of California's Cartwright Act (Cal. Bus. & Prof. Code § 16700, *et seq.*)
### (Against All Defendants)

198.     By reason of the conduct alleged herein, Defendants have violated California Bus. & Prof. Code §§ 16700, *et seq.*

199.     Each Defendant entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce as alleged herein in violation of California Bus. & Prof. Code §§ 16700, 16720, *et seq*. To maintain the price of CPPs containing the Relevant AIs and their generic competitor CPPs at supra-competitive levels at the California Class's expense, each Defendant has combined and conspired to restrain and exclude competition in the relevant markets.

200.     Each Defendants' anticompetitive conduct was knowing and willful and constitutes a flagrant violation of §§ 16700, *et seq*.

201.     Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within California, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant markets.

202.     Defendants' exclusionary agreements with retailers and distributors prohibit or restrain retailers and distributors from purchasing generic CPPs.

203.     Injury to members of the California Class was a direct, foreseeable, and proximate result of Defendants' exclusionary agreements.

204.     Members of the California Class have suffered irreparable harm and do not have an adequate remedy at law.   Accordingly, members of the California Class seek injunctive and equitable relief.

205.     As a direct and proximate result of Defendants' unlawful conduct, the members of

48

the California Class have been injured in their business or property by paying more for CPPs containing the Relevant AIs and their generic competitor CPPs than they otherwise would have paid but for Defendants' unlawful conduct. As a result of Defendants' violation of Section 16700, *et seq.*, the California Class seeks treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a).

## COUNT SIX

### <u>Violation of the District of Columbia Antitrust Act (D.C. Code § 28-4501, *et seq.*)</u>
### (Against All Defendants)

206.    By reason of the conduct alleged herein, Defendants have violated District of Columbia Code §§ 28-4501, *et seq*.

207.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within the District of Columbia.

208.    Defendants monopolized or attempted to monopolize a substantial part of trade or commerce within the District of Columbia.

209.    Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

210.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the District of Columbia Class have been injured in their business or property and are threatened with further injury.

211.    By reason of the foregoing, the District of Columbia Class is entitled to seek all forms of relief available under District of Columbia Code §§ 28-4501, *et seq*.

49

## COUNT SEVEN

### Violation of the Guam Antitrust Law (Guam Code Ann. tit. 9 §§ 69.10, *et seq.*)
### (Against All Defendants)

212. By reason of the conduct alleged herein, Defendants have violated the Guam Antitrust Law, Guam Code Ann. tit. 9 §§ 69.10, *et seq*.

213. Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Guam.

214. Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which occurred in Guam.

215. Defendants' violations of Guam law were flagrant.

216. Defendants' unlawful conduct substantially affected Guam's trade and commerce.

217. As a direct and proximate cause of Defendants' unlawful conduct, the members of the Guam Class have been injured in their business or property and are threatened with further injury.

218. By reason of the foregoing, the Guam Class is entitled to seek all forms of relief available under Guam Code Ann. tit. 9 §§ 69.10, *et seq*.

## COUNT EIGHT

### Violation of the Illinois Antitrust Act (740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*)
### (Against All Defendants)

219. By reason of the conduct alleged herein, Defendants have violated the Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq*.

220. Each Defendant entered into a contract or combination in the form of trust or

50

otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Illinois.

221.    Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which occurred in Illinois.

222.    Defendants' unlawful conduct substantially affected Illinois's trade and commerce.

223.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Illinois Class have been injured in their business or property and are threatened with further injury.

224.    By reason of the foregoing, the Illinois Class is entitled to seek all forms of relief available under 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq*.

## COUNT NINE

### Violation of the Iowa Competition Law (Iowa Code §§ 553.1, *et seq.*)
### (Against All Defendants)

225.    By reason of the conduct alleged herein, Defendants have violated Iowa Code §§ 553.1, *et seq*.

226.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Iowa.

227.    Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which occurred in Iowa.

228. Defendants' violations of Iowa law were flagrant.

229. Defendants' unlawful conduct substantially affected Iowa's trade and commerce.

230. As a direct and proximate cause of Defendants' unlawful conduct, the members of the Iowa Class have been injured in their business or property and are threatened with further injury.

231. By reason of the foregoing, the Iowa Class is entitled to seek all forms of relief available under Iowa Code §§ 553.1, *et seq*.

## COUNT TEN

### Violation of the Kansas Restraint of Trade Act (Kan. Stat. Ann. § 50-101, *et seq.*)
### (Against All Defendants)

232. By reason of the conduct alleged herein, Defendants have violated the Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101, *et seq*.

233. Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Kansas.

234. Defendants entered into arrangements, contracts, agreements, trusts, or combinations with at least one other person with a view or which tend to preclude full and free competition in the importation, transportation, or sale of CPPs containing the Relevant AIs and their generic competitor CPPs in Kansas.

235. Defendants' unlawful conduct substantially affected Kansas's trade and commerce.

236. As a direct and proximate cause of Defendants' unlawful conduct, the members of the Kansas Class have been injured in their business or property and are threatened with further injury.

237. By reason of the foregoing, the Kansas Class is entitled to seek all forms of relief

52

available under Kansas Stat. Ann. §§ 50-101, *et seq*.

**COUNT ELEVEN**

**<u>Violation of Maine's Antitrust Statute (Me. Rev. Stat. Ann. Tit. 10, §§ 1101, *et seq.*)</u>**
**(Against All Defendants)**

238.     By reason of the conduct alleged herein, Defendants have violated Maine's Antitrust Statute, Me. Rev. Stat. Ann. Tit. 10, §§ 1101, *et seq*.

239.     Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Maine.

240.     Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which occurred in Maine.

241.     Defendants' unlawful conduct substantially affected Maine's trade and commerce.

242.     As a direct and proximate cause of Defendants' unlawful conduct, the members of the Maine Class have been injured in their business or property and are threatened with further injury.

243.     By reason of the foregoing, the Maine Class is entitled to seek all forms of relief available under Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq*.

**COUNT TWELVE**

**<u>Violation of the Michigan Antitrust Reform Act (Mich. Comp. Laws §§ 445.771, *et seq.*)</u>**
**(Against All Defendants)**

244.     By reason of the conduct alleged herein, Defendants have violated the Michigan Antitrust Reform Act, Michigan Comp. Laws. Ann. §§ 445.771, *et seq*.

245.     Each Defendant entered into a contract or combination in the form of trust or

53

otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Michigan.

246.     Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which occurred in Michigan.

247.     Defendants' unlawful conduct substantially affected Michigan's trade and commerce.

248.     As a direct and proximate cause of Defendants' unlawful conduct, the members of the Michigan Class have been injured in their business or property and are threatened with further injury.

249.     By reason of the foregoing, the Michigan Class is entitled to seek all forms of relief available under Michigan Comp. Laws. Ann. §§ 445.771, *et seq*.

## COUNT THIRTEEN

### Violation of the Minnesota Antitrust Law (Minn. Stat. §§ 325D.49, *et seq.*)
### (Against All Defendants)

250.     By reason of the conduct alleged herein, Defendants have violated the Minnesota Antitrust Law, Minn. Stat. §§ 325D.49, *et seq*.

251.     Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Minnesota.

252.     Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which

54

occurred in Minnesota.

253.    Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

254.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Minnesota Class have been injured in their business or property and are threatened with further injury.

255.    By reason of the foregoing, the Minnesota Class is entitled to seek all forms of relief available under Minn. Stat. §§ 325D.49, *et seq.*

## COUNT FOURTEEN

### Violation of the Mississippi Antitrust Statute (Miss. Code Ann. §§ 75-21-1, *et seq.*)
**(Against All Defendants)**

256.    By reason of the conduct alleged herein, Defendants have violated the Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-1, *et seq.*

257.    Defendants combined, contracted, understood and agreed in the relevant markets, in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of CPPs containing the Relevant AIs and hindering competition in the sale of CPPs containing the Relevant AIs, in violation of Miss. Code Ann. § 75-21-1(a), *et seq.*

258.    Defendants monopolized or attempted to monopolize the production, control or sale of CPPs containing the Relevant AIs and their generic competitor CPPs, in violation of Miss. Code Ann. §§ 75-21-3, *et seq.*

259.    Defendants' unlawful conduct substantially affected Mississippi's trade and commerce.

260.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Mississippi Class have been injured in their business or property and are threatened with further

injury.

261.    By reason of the foregoing, the Mississippi Class is entitled to seek all forms of relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

## COUNT FIFTEEN

### Violation of the Missouri Merchandising Practices Act (Mo. Ann. Stat. §§ 407.010, *et seq.*)
### (Against All Defendants)

262.    By reason of the conduct alleged herein, Defendants have violated the Missouri Merchandising Practices Act, Mo. Ann. Stat. §§ 407.010, *et seq.*

263.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Missouri.

264.    Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which occurred in Missouri.

265.    Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

266.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Missouri Class have been injured in their business or property and are threatened with further injury.

267.    By reason of the foregoing, the Missouri Class is entitled to seek all forms of relief available under Mo. Ann. Stat. §§ 407.010, *et seq.*

## COUNT SIXTEEN

### Violation of the Nebraska Junkin Act (Neb. Rev. Stat. §§ 59-801, *et seq.*)
### (Against All Defendants)

56

268. By reason of the conduct alleged herein, Defendants have violated the Nebraska Junkin Act, Neb. Rev. Stat. §§ 59-801, *et seq.*

269. Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Nebraska.

270. Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which occurred in Nebraska.

271. Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

272. As a direct and proximate cause of Defendants' unlawful conduct, the members of the Nebraska Class have been injured in their business or property and are threatened with further injury.

273. By reason of the foregoing, the Nebraska Class is entitled to seek all forms of relief available under Nebraska Rev. Stat. §§ 59-801, *et seq.*

## COUNT SEVENTEEN

### Violation of the Nevada Unfair Trade Practices Act (Nev. Rev. Stat. §§ 598A.010, *et seq.*)
### (Against All Defendants)

274. By reason of the conduct alleged herein, Defendants have violated the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010, *et seq.*

275. Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Nevada.

57

276. Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which occurred in Nevada.

277. Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

278. As a direct and proximate cause of Defendants' unlawful conduct, the members of the Nevada Class have been injured in their business or property and are threatened with further injury.

279. By reason of the foregoing, the Nevada Class is entitled to seek all forms of relief available under Nebraska Rev. Stat. §§ 59-801, *et seq*.

## COUNT EIGHTEEN

### Violation of New Hampshire's Antitrust Statute (N.H. Rev. Stat. §§ 356:1, *et seq.*)
### (Against All Defendants)

280. By reason of the conduct alleged herein, Defendants have violated New Hampshire's Antitrust Statute, N.H. Rev. Stat. §§ 356:1, *et seq*.

281. Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within New Hampshire.

282. Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which occurred in New Hampshire.

283. Defendants' unlawful conduct substantially affected New Hampshire's trade and

58

commerce.

284. As a direct and proximate cause of Defendants' unlawful conduct, the members of the New Hampshire Class have been injured in their business or property and are threatened with further injury.

285. By reason of the foregoing, the New Hampshire Class is entitled to seek all forms of relief available under New Hampshire Rev. Stat. §§ 356:1, *et seq*.

**COUNT NINETEEN**

**Violation of the New Mexico Antitrust Act (N.M. Stat. Ann. §§ 57-1-1, *et seq.*)**
**(Against All Defendants)**

286. By reason of the conduct alleged herein, Defendants have violated the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq*.

287. Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within New Mexico.

288. Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which occurred in New Mexico.

289. Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

290. As a direct and proximate cause of Defendants' unlawful conduct, the members of the New Mexico Class have been injured in their business or property and are threatened with further injury.

291. By reason of the foregoing, the New Mexico Class is entitled to seek all forms of

59

relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

**COUNT TWENTY**

**<u>Violation of Section 340 of the New York General Business Law (New York Gen. Bus. Law §§ 340, *et seq.*)</u>**
**(Against All Defendants)**

292.    By reason of the conduct alleged herein, Defendants have violated Section 340 of the New York General Business Law, New York Gen. Bus. Law §§ 340, *et seq*.

293.    Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of CPPs containing the Relevant AIs and their generic competitor CPPs and restrained competition in the free exercise of the conduct of the business of CPPs containing the Relevant AIs and their generic competitor CPPs within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law §§ 340, *et seq*.

294.    Defendants' unlawful conduct substantially affected New York's trade and commerce.

295.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the New York Class have been injured in their business or property and are threatened with further injury.

296.    By reason of the foregoing, the New York Class is entitled to seek all forms of relief available under New York Gen. Bus. Law §340, *et seq*.

**COUNT TWENTY-ONE**

**<u>Violation of the North Carolina General Statutes (N.C. Gen. Stat. §§ 75-1, *et seq.*)</u>**
**(Against All Defendants)**

297.    By reason of the conduct alleged herein, Defendants have violated the North Carolina General Statutes, N.C. Gen. Stat. §§ 75-1, *et seq*.

298.    Each Defendant entered into a contract or combination in the form of trust or

60

otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within North Carolina.

299.    Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which occurred in North Carolina.

300.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

301.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

302.    By reason of the foregoing, the North Carolina Class is entitled to seek all forms of relief available under North Carolina Gen. Bus. Law §340, *et seq*.

**COUNT TWENTY-TWO**

**Violation of the North Dakota Uniform State Antitrust Act (N.D. Cent. Code §§ 51-08.1-01, *et seq.*)**
**(Against All Defendants)**

303.    By reason of the conduct alleged herein, Defendants have violated the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq*.

304.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within North Dakota.

305.    Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which

61

occurred in North Dakota.

306.     Defendants' violations of North Dakota law were flagrant.

307.     Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

308.     As a direct and proximate cause of Defendants' unlawful conduct, the members of the North Dakota Class have been injured in their business or property and are threatened with further injury.

309.     By reason of the foregoing, the North Dakota Class is entitled to seek all forms of relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

## COUNT TWENTY-THREE

### Violation of the Oregon Antitrust Law (Or. Rev. Stat. §§ 646.705, *et seq.*)
### (Against All Defendants)

310.     By reason of the conduct alleged herein, Defendants have violated the Oregon Antitrust Law, Or. Rev. Stat. §§ 646.705, *et seq*.

311.     Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Oregon.

312.     Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which occurred in Oregon.

313.     Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

314.     As a direct and proximate cause of Defendants' unlawful conduct, the members of the Oregon Class have been injured in their business or property and are threatened with further

62

injury.

315.     By reason of the foregoing, the Oregon Class is entitled to seek all forms of relief available under Oregon Rev. Stat. §§ 646.705, *et seq.*

## COUNT TWENTY-FOUR

### Violation of the Rhode Island Antitrust Act (R.I. Gen. Laws §§ 6-36-1, *et seq.*)
### (Against All Defendants)

316.     By reason of the conduct alleged herein, Defendants have violated the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq*.

317.     Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Rhode Island.

318.     Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which occurred in Rhode Island.

319.     Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

320.     As a direct and proximate cause of Defendants' unlawful conduct, the members of the Rhode Island Class have been injured in their business or property and are threatened with further injury.

321.     By reason of the foregoing, the Rhode Island Class is entitled to seek all forms of relief available under R.I. Gen. Laws § 6-36-11, *et seq*.

## COUNT TWENTY-FIVE

### Violation of the South Dakota Antitrust Statute (S.D. Codified Laws §§ 37-1-3.1, *et seq.*)
### (Against All Defendants)

63

322. By reason of the conduct alleged herein, Defendants have violated the South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-3.1, *et seq*.

323. Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within South Dakota.

324. Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which occurred in South Dakota.

325. Defendants' unlawful conduct substantially affected South Dakota's trade and commerce.

326. As a direct and proximate cause of Defendants' unlawful conduct, the members of the South Dakota Class have been injured in their business or property and are threatened with further injury.

327. By reason of the foregoing, the South Dakota Class is entitled to seek all forms of relief available under South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

**COUNT TWENTY-SIX**

**<u>Violation of the Tennessee Trade Practices Act (Tenn. Code Ann. §§ 47-25-101, *et seq.*)</u>**
**(Against All Defendants)**

328. By reason of the conduct alleged herein, Defendants have violated the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq*.

329. Each Defendant entered into arrangements, contracts, agreements, trusts, or combinations with persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of CPPs containing the Relevant AIs imported

64

into Tennessee.

330.    Competition in the relevant markets was restrained, suppressed, and eliminated throughout Tennessee.

331.    Each Defendant has entered into arrangements, contracts, agreements, trusts, or combinations with persons or corporations designed to, or which tend to, advance or control the price or the cost to producers or consumers in the relevant markets throughout Tennessee.

332.    Defendants' unlawful conduct substantially affected Tennessee's trade and commerce.

333.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Tennessee Class have been injured in their business or property and are threatened with further injury.

334.    By reason of the foregoing, the Tennessee Class is entitled to seek all forms of relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

## COUNT TWENTY-SEVEN

### Violation of the Utah Antitrust Act (Utah Code Ann. §§ 76-10-3101, *et seq.*)
**(Against All Defendants)**

335.    By reason of the conduct alleged herein, Defendants have violated the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq*.

336.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Utah.

337.    Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which

65

occurred in Utah.

338.    Defendants' unlawful conduct substantially affected Utah's trade and commerce.

339.    As a direct and proximate cause of Defendants' unlawful conduct, the members of Utah Class have been injured in their business or property and are threatened with further injury.

340.    By reason of the foregoing, the Utah Class is entitled to seek all forms of relief available under Utah Code Ann. §§ 76-10-3101, *et seq*.

## COUNT TWENTY-EIGHT

**Violation of the West Virginia Antitrust Act (W. Va. Code §§ 47-18-1, *et seq*.)**
**(Against All Defendants)**

341.    By reason of the conduct alleged herein, Defendants have violated the West Virginia Antitrust Act, W. Va. Code §§ 47-18-1, *et seq*.

342.    During the Class Period, Defendants engaged in anticompetitive conduct alleged above, including a continuing contract, combination, or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia and the establishment or maintenance of a monopoly for the purpose of excluding competition, in violation of W. Va. Code § 47-18-1, *et seq*.

343.    Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred in West Virginia.

344.    Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within West Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant markets.

345.    Defendants' unlawful conduct substantially affected West Virginia's trade and

commerce.

346. As a direct and proximate cause of Defendants' unlawful conduct, the members of West Virginia Class have been injured in their business or property and are threatened with further injury.

347. By reason of the foregoing, the West Virginia Class is entitled to seek all forms of relief available under West Virginia Code §§ 47-18-1, *et seq*.

<strong>COUNT TWENTY-NINE</strong>

<strong><u>Violation of the Wisconsin Antitrust Act (Wis. Stat. Ann. §§ 133.01, <em>et seq.</em>)</u></strong><br><strong>(Against All Defendants)</strong>

348. By reason of the conduct alleged herein, Defendants have violated the Wisconsin Antitrust Act, Wis. Stat. Ann. §§ 133.01, *et seq*.

349. Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Wisconsin.

350. Defendants attempted to establish or established, maintained, or used a monopoly of trade or commerce in the relevant markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the relevant markets, a substantial part of which occurred in Wisconsin.

351. Defendants' unlawful conduct substantially affected Wisconsin's trade and commerce.

352. As a direct and proximate cause of Defendants' unlawful conduct, the members of Wisconsin Class have been injured in their business or property and are threatened with further injury.

353. By reason of the foregoing, Plaintiffs and the Wisconsin Class are entitled to seek

67

all forms of relief available under Wis. Stat. Ann. §§ 133.01, *et seq*.

### VIOLATIONS OF STATE CONSUMER PROTECTION & UNFAIR TRADE PRACTICES LAWS

354.     The preceding factual statements and allegations are incorporated by reference.

355.     Defendants' unfair, unconscionable, deceptive, false, or fraudulent acts or trade practices violated the state consumer protection and unfair trade practices statutes of the states listed below, causing direct and proximate harm to the money, business, or property of the members of the Classes for the states listed below.

### COUNT THIRTY

### Violation of the Arkansas Deceptive Trade Prac. Act (Ark. Code Ann. §§ 4-88-101, *et seq.*)
### (Against All Defendants)

356.     By reason of the conduct alleged herein, Defendants have violated the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-101, *et seq*.

357.     During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within Arkansas.

358.     During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within Arkansas, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

359.     Defendants' conduct substantially affected Arkansas's trade and commerce.

360.     Defendants' conduct constitutes unconscionable, false, or deceptive acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10).

361.     Defendants' unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Arkansas Class to pay supra-

68

competitive prices, injuring them in their business or property.

362. Accordingly, members of the Arkansas Class seek actual damages and attorney's fees pursuant to Ark. Code Ann. § 4-88-113(f).

## COUNT THIRTY-ONE

### Violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*) (the "UCL") (Against All Defendants)

363. By reason of the conduct alleged herein, Defendants have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.

364. The violations of federal antitrust law set forth above also constitute violations of section 17200*, et seq.* of California Business and Professions Code.

365. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

366. This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these defendants for acts, as alleged herein, that violated the UCL.

367. The defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

368. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether in violation of section 16720, *et seq.*, of California Business and

69

Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

369.    Plaintiffs and members of the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

370.    The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.

371.    The unlawful and unfair business practices of defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the California Class to pay supra-competitive and artificially inflated prices for CPPs containing the Relevant AIs and their generic counterparts sold in the State of California. Plaintiffs and the members of the California Class suffered injury in fact and lost money or property as a result of such unfair competition.

372.    Accordingly, members of the California Class seek restitution pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5, as this action was brought to enforce an important right affecting the public interest for a large class of persons, the necessity and financial burden of private enforcement are such as to make the award appropriate, and such fees should not in the interest of justice be paid out of the recovery, if any.

## COUNT THIRTY-TWO

### Violation of the District of Columbia Consumer Protection Procedures Act (D.C. Code §§ 28-3901, *et seq.*)
### (Against All Defendants)

373.    By reason of the conduct alleged herein, Defendants have violated the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et seq*.

374.    During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within the District of Columbia.

375.    During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within the District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

376.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

377.    Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

378.    Defendants' unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the District of Columbia Class to pay supra-competitive prices, injuring them in their business or property.

379.    Accordingly, members of the District of Columbia Class seek all forms of relief, including treble damages or $1500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. Code § 28-3901, *et seq.*

## COUNT THIRTY-THREE

## Violation of the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. §§ 501.201(2), *et seq.*)
### (Against All Defendants)

380.    By reason of the conduct alleged herein, Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201(2), *et seq*.

381.    During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in

71

the relevant markets, a substantial part of which occurred within Florida.

382. During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within Florida, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

383. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within Florida.

384. Defendants' unlawful conduct substantially affected Florida's trade and commerce.

385. Defendants' unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Florida Class to pay supra-competitive prices, injuring them in their business or property.

386. Accordingly, members of the Florida Class seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

## COUNT THIRTY-FOUR

### Violation of the Hawaii Revised Statutes (Hawaii Rev. Stat. Ann. §§ 480-1, *et seq.*)
(Against All Defendants)

387. By reason of the conduct alleged herein, Defendants have violated Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

388. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

389. Defendants' unlawful conduct had the following effects: (1) CPPs containing the Relevant AIs price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) prices for CPPs containing the Relevant AIs were, fixed, maintained, and stabilized at artificially

72

high levels throughout Hawaii; (3) Plaintiffs and members of the Hawaii Class were deprived of free and open competition; and (4) Plaintiffs and members of the Hawaii Class paid supra-competitive, artificially inflated prices for CPPs containing the Relevant AIs and their generic counterparts.

390.    During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

391.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Hawaii Class have been injured and are threatened with further injury.

392.    Accordingly, members of the Hawaii Class seek all forms of relief available under Haw. Rev. Stat. §§ 480, *et seq*.

## COUNT THIRTY-FIVE

### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. Ann. §§ 505/10A, *et seq.*)
### (Against All Defendants)

393.    By reason of the conduct alleged herein, Defendants have violated the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill. Comp. Stat. Ann. §§ 505/10A, *et seq*.

394.    During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within Illinois.

395.    During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

396.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within Illinois.

73

397. Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the Classes.

398. Defendants' unlawful conduct substantially affected Illinois's trade and commerce.

399. Defendants' unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Illinois Class to pay supra-competitive prices, injuring them in their business or property.

400. Accordingly, members of the Illinois Class seek all forms of relief, including actual damages or any other relief the Court deems proper under 815 Ill. Comp. Stat. Ann. 505/10A, *et seq.*

## COUNT THIRTY-SIX

### Violation of the Maine Unfair Trade Practices Act (5 M.R.S. §§ 207, *et seq.*)
### (Against All Defendants)

401. By reason of the conduct alleged herein, Defendants have violated the Maine Unfair Trade Practices Act, 5 M.R.S. §§ 207, *et seq.*

402. Plaintiffs reserve their right to bring a claim under 5 M.R.S. §§ 207, *et seq.* Pursuant to 5 M.R.S. § 213(1-A), on February 17, 2023, other plaintiffs represented by Plaintiffs' counsel mailed all Defendants, via certified mail, return receipt requested, Demand for Payment Letters. In accordance with the statute, these letters effectively put Defendants on notice as to Plaintiffs' identical claims, explaining the unfair acts and the injury suffered, and requesting relief from Defendants within 30 days. If necessary, Plaintiffs will amend to add specific claims under 5 M.R.S. §§ 207, *et seq.*

## COUNT THIRTY-SEVEN

### Violation of the Massachusetts Consumer Protection Act (Mass. Gen. Laws Ch. 93A § 1, *et seq.*)
### (Against All Defendants)

74

403. By reason of the conduct alleged herein, Defendants have violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A § 1, *et seq.*

404. Plaintiffs reserve their right to bring a claim under Mass. Gen. Laws Ch. 93A *et seq.* Pursuant to Mass. Gen. Laws Ch. 93A § 9, on February 17, 2023, other plaintiffs represented by Plaintiffs' counsel mailed all Defendants, via certified mail, return receipt requested, Demand for Payment Letters. In accordance with the statute, these letters effectively put Defendants on notice as to Plaintiffs' identical claims, explaining the unfair acts and the injury suffered, and requesting relief from Defendants within 30 days. If necessary, Plaintiffs will amend to add specific claims under Mass. Gen. Laws Ch. 93A *et seq.*

## COUNT THIRTY-EIGHT

### Violation of the Michigan Consumer Protection Act (Mich. Comp. Laws Ann. §§ 445.901, *et seq.*)
### (Against All Defendants)

405. By reason of the conduct alleged herein, Defendants have violated the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. §§ 445.901, *et seq.*

406. During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within Michigan.

407. During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within Michigan, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

408. Defendants' conduct was conducted with the intent to deceive Michigan consumers regarding the nature of Defendants' actions within the stream of Michigan commerce.

409. Defendants' conduct was an unfair method of competition, and an unfair or

75

deceive act or practice within the conduct of commerce within the State of Michigan.

410. Defendants' conduct misled consumers, withheld material facts, and took advantage of Plaintiffs' and members of the Classes' inability to protect themselves.

411. Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the Classes.

412. Defendants' unlawful conduct substantially affected Michigan's trade and commerce.

413. Defendants' unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Michigan Class to pay supra-competitive prices, injuring them in their business or property.

414. Accordingly, members of the Michigan Class seek all forms of relief available under Mich. Comp. Laws Ann. § 445.911.

**COUNT THIRTY-NINE**

**<u>Violation of the Minnesota Consumer Fraud Act (Minn. Stat. §§ 325F.68, *et seq.*)</u>**
**(Against All Defendants)**

415. By reason of the conduct alleged herein, Defendants have violated the Minnesota Consumer Fraud Act, Minn. Stat. §§ 325F.68, *et seq*.

416. Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

417. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within Minnesota, for the purpose of controlling, fixing, or maintaining prices in the relevant markets.

418. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct

76

of commerce within the State of Minnesota.

419. Defendants' conduct, specifically in the form of fraudulent concealment of their horizontal agreement, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

420. Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

421. Defendants' conduct was willful.

422. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Minnesota Class have been injured in their business or property and are threatened with further injury.

423. Accordingly, members of the Minnesota Class seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. § 325F.68, *et seq*. and applicable case law.

## COUNT FORTY

### Violation of the Missouri Merchandising Practices Act (Mo. Ann. Stat. §§ 407.010, *et seq.*) (Against All Defendants)

424. By reason of the conduct alleged herein, Defendants have violated the Missouri Merchandising Practices Act, Mo. Ann. Stat. §§ 407.010, *et seq*.

425. During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within Missouri.

426. During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within the Missouri, for the purpose of excluding competition or

controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

427.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

428.    Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and the members of the Missouri Class concerning Defendants' unlawful activities. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and the members of the Missouri Class as they relate to the cost of CPPs containing the Relevant AIs they purchased.

429.    Defendants' conduct concerning the price of CPPs containing the Relevant AIs was deceptive as it had the tendency or capacity to mislead Plaintiffs and the members of the Missouri Class to believe that they were purchasing CPPs containing the Relevant AIs at prices established by a free and fair market.

430.    Defendants' unlawful conduct substantially affected Missouri commerce.

431.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Missouri Class suffered ascertainable loss of money or property.

432.    Accordingly, Plaintiffs and members of the Missouri Class seek all relief available under the MMPA, specifically Mo. Rev. Stat. § 407.020, as further interpreted by Title 15 of the Missouri Code of State Regulations, 15 CSR 60-7.010, et seq., 15 CSR 60-8.010, *et seq*., and 15 CSR 60-9.010, *et seq*., and Mo. Rev. Stat. § 407.025 which provides for the relief sought in this count.

**COUNT FORTY-ONE**

**Violation of the Nebraska Consumer Protection Act (Neb. Rev. Stat. §§ 59-1602, *et seq.*)**
**(Against All Defendants)**

433.    By reason of the conduct alleged herein, Defendants have violated the Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1602, *et seq*.

434.    During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within Nebraska.

435.    During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within Nebraska, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

436.    Defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of Defendants' actions within the stream of Nebraska commerce.

437.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

438.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs' and members of the Nebraska Class's ability to protect themselves.

439.    Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

440.    Defendants' unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Nebraska Class to pay supra-competitive prices, injuring them in their business or property.

441.    Accordingly, members of the Nebraska Class seek actual damages, costs of suit, attorney's fees, and any other award of damages authorized by Neb. Rev. Stat. § 59-1609.

## COUNT FORTY-TWO

## Violation of the Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. §§ 598.0903, *et seq.*)
### (Against All Defendants)

442.    By reason of the conduct alleged herein, Defendants have violated the Nevada

79

Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq*.

443. Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

444. During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

445. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

446. Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

447. Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

448. Defendants' conduct was willful.

449. As a direct and proximate cause of Defendants' unlawful conduct, the members of the Nevada Class have been injured in their business or property and are threatened with further injury.

450. Accordingly, members of the Nevada Class seek all forms of relief including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nev. Rev. Stat. § 598.0993.

**COUNT FORTY-THREE**

**Violation of the New Hampshire Consumer Protection Act (N.H. Rev. Stat. Ann. Tit. XXXI §§ 358-A, *et seq*.)**
**(Against All Defendants)**

451. By reason of the conduct alleged herein, Defendants have violated the New

Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. Tit. XXXI §§ 358-A, *et seq*.

452. Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

453. During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within New Hampshire, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

454. Defendants' conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of Defendants' actions within the stream of New Hampshire commerce.

455. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

456. Defendants' conduct was willful and knowing.

457. Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs' and members of the New Hampshire Class's ability to protect themselves.

458. Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

459. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the New Hampshire Class have been injured in their business or property and are threatened with further injury.

460. Accordingly, members of the New Hampshire Class seek all forms of relief available under N.H. Rev. Stat. Ann. tit. XXXI, §§ 358-A:10 and 358-A:10-a.

## COUNT FORTY-FOUR

## Violation of the New Mexico Unfair Trade Prac. Act (N.M. Stat. Ann. §§ 57-12-3, *et seq.*)
### (Against All Defendants)

461.    By reason of the conduct alleged herein, Defendants have violated the New Mexico Unfair Trade Practices Act, N.M. Stat. Ann. §§ 57-12-3, *et seq*.

462.    During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within New Mexico.

463.    During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

464.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

465.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the New Mexico Class.

466.    Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

467.    Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the New Mexico Class members and the price paid by them for CPPs containing the Relevant AIs as set forth in N.M. Stat. Ann. § 57-12-2E.

468.    Defendants' conduct was willful.

469.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and

82

the members of the New Mexico Class have been injured in their business or property and are threatened with further injury.

470.    Accordingly, members of the New Mexico Class seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

**COUNT FORTY-FIVE**

**Violation of the North Carolina Unfair Trade and Business Practices Act (N.C. Gen. Stat. §§ 75-1.1, _et seq._)**
**(Against All Defendants)**

471.    By reason of the conduct alleged herein, Defendants have violated the North Carolina Unfair Trade and Business Practices Act, N.C. Gen. Stat. §§ 75-1.1, _et seq_.

472.    During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within North Carolina.

473.    During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within North Carolina, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

474.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

475.    Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

476.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the North Carolina Class.

477.    Defendants' unlawful conduct substantially affected North Carolina's trade and

83

commerce.

478.    Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

479.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

480.    Accordingly, members of the North Carolina Class seek all forms of relief, including treble damages under N.C. Gen. Stat. § 7516.

## COUNT FORTY-SIX

## Violation of the North Dakota Unfair Trade Prac. Law (N.D. Cent. Code §§ 51-10, *et seq.*)
### (Against All Defendants)

481.    By reason of the conduct alleged herein, Defendants have violated the North Dakota Unfair Trade Practices Law, N.D. Cent. Code §§ 51-10, *et seq*.

482.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

483.    During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within North Dakota.

484.    During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within North Dakota, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

84

485. Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

486. Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

487. Defendants' conduct was willful.

488. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the North Dakota Class have been injured in their business or property and are threatened with further injury.

489. Accordingly, members of the North Dakota Class seek all forms of relief, including damages and injunctive relief under N.D. Cent. Code § 51-10-06.

## COUNT FORTY-SEVEN

### Violation of the Oregon Unlawful Trade Practices Act (Or. Rev. Stat. §§ 646.605, *et seq.*)
### (Against All Defendants)

490. By reason of the conduct alleged herein, Defendants have violated the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. §§ 646.605, *et seq*.

491. Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

492. During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within Oregon.

493. During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within Oregon, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

85

494. Defendants' conduct was conducted with the intent to deceive Oregon consumers regarding the nature of Defendants' actions within the stream of Oregon commerce.

495. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

496. Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs' and members of the Oregon Class's ability to protect themselves.

497. Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

498. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Oregon Class have been injured in their business or property and are threatened with further injury.

499. Accordingly, members of the Oregon Class seek all forms of relief available under Or. Rev. Stat. § 646.638.

## COUNT FORTY-EIGHT

## Violation of the Rhode Island Deceptive Trade Practices Act (R.I. Gen. Laws §§ 6-13.1-1, *et seq.*)
### (Against All Defendants)

500. By reason of the conduct alleged herein, Defendants have violated the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq*.

501. Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

502. During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within Rhode Island.

503. During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial

part of which occurred within Rhode Island, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

504. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

505. Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

506. Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

507. Defendants' conduct was willful.

508. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Rhode Island Class concerning Defendants' unlawful activities, including the horizontal conspiracy and artificially inflated prices for CPPs containing the Relevant AIs and their generic counterparts.

509. Defendants' deception, including its affirmative misrepresentations and/or omissions concerning the price of CPPs containing the Relevant AIs, constitutes information necessary to Plaintiffs and members of the Rhode Island Class relating to the cost of CPPs containing Relevant AIs purchased.

510. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Rhode Island Class have been injured in their business or property and are threatened with further injury.

511. Accordingly, members of the Rhode Island Class seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. Gen Laws § 6-13.1-5.2.

## COUNT FORTY-NINE

## Violation of South Carolina's Unfair Trade Prac. Act (S.C. Code Ann. §§ 39-5-10, *et seq.*)
**(Against All Defendants)**

512.    By reason of the conduct alleged herein, Defendants have violated South Carolina's Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq*.

513.    During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within South Carolina.

514.    During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within South Carolina, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

515.    Defendants' conduct was conducted with the intent to deceive South Carolina consumers regarding the nature of Defendants' actions within the stream of South Carolina commerce.

516.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina.

517.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs' and members of the South Carolina Class's ability to protect themselves.

518.    Defendants' conduct was willful.

519.    Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

520.    Defendants' deception, including its affirmative misrepresentations and/or

88

omissions concerning the price of CPPs containing the Relevant AIs, constitutes information necessary to Plaintiffs and members of the South Carolina Class relating to the cost of CPPs containing the Relevant AIs purchased.

521.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the South Carolina Class have been injured in their business or property and are threatened with further injury.

522.    Accordingly, members of the South Carolina Class seek all forms of relief, including treble damages or and reasonable attorneys' fees and costs under S.C. Code Ann. § 39-5-140.

## COUNT FIFTY

### Violation of the South Dakota Deceptive Trade Practices and Consumer Protection Law (S.D. Codified Laws §§ 37-24, *et seq.*)
### (Against All Defendants)

523.    By reason of the conduct alleged herein, Defendants have violated the South Dakota Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37-24, *et seq*.

524.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

525.    During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within South Dakota.

526.    During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within South Dakota, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

527.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct

89

of commerce within the State of South Dakota.

528.  Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

529.  Defendants' unlawful conduct substantially affected South Dakota's trade and commerce.

530.  Defendants' conduct was willful.

531.  As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the South Dakota Class have been injured in their business or property and are threatened with further injury.

532.  Accordingly, members of the South Dakota Class seek all forms of relief, including actual damages and injunctive relief under S.D. Codified Laws § 37-24-31.

**COUNT FIFTY-ONE**

**<u>Violation of the Utah Consumer Sales Practices Act (Utah Code Ann. §§ 13-11-1, *et seq.*)</u>**
**(Against All Defendants)**

533.  By reason of the conduct alleged herein, Defendants have violated the Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1, *et seq*.

534.  During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within Utah.

535.  During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

536.  Defendants' conduct was unfair, unconscionable, or deceptive within the conduct

90

of commerce within the State of Utah.

537.    Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions.

538.    Defendants knew or had reason to know that their conduct was unconscionable.

539.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the Utah Class.

540.    Defendants' unlawful conduct substantially affected Utah's trade and commerce.

541.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Utah Class have been injured in their business or property and are threatened with further injury.

542.    Accordingly, members of the Utah Class seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief, pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

## COUNT FIFTY-TWO

### Violation of the Utah Unfair Practices Act (Utah Code Ann. §§ 13-5-1, *et seq.*)
### (Against All Defendants)

543.    By reason of the conduct alleged herein, Defendants have violated the Utah Unfair Practices Act, Utah Code Ann. §§ 13-5-1, *et seq*.

544.    During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within Utah.

545.    During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing,

91

or maintaining prices in the market for CPPs containing the Relevant AIs.

546.    Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Utah.

547.    Defendants' unlawful conduct substantially affected Utah's trade and commerce.

548.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Utah Class have been injured in their business or property and are threatened with further injury.

549.    Accordingly, members of the Utah Class seek all forms of relief, including actual damages or $2000 per Utah Class member, whichever is greater, plus reasonable attorney's fees under Utah Code Ann. §§ 13-5-14, *et seq*.

**COUNT FIFTY-THREE**

**<u>Violation of the Vermont Consumer Fraud Act (Vt. Stat. Ann. tit. 9 §§ 2453, *et seq.*)</u>**
**(Against All Defendants)**

550.    By reason of the conduct alleged herein, Defendants have violated the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. §§ 2453, *et seq*.

551.    During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within Vermont.

552.    Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

553.    Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

554.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Vermont Class have been injured in their business or property and are

threatened with further injury.

555.    Accordingly, members of the Vermont Class seek all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

**COUNT FIFTY-FOUR**

**<u>Violation of the Virginia Consumer Protection Act (Va. Code Ann. §§ 59.1-196, *et seq.*)</u>**
**(Against All Defendants)**

556.    By reason of the conduct alleged herein, Defendants have violated the Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196, *et seq*.

557.    During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the relevant markets, a substantial part of which occurred within Virginia.

558.    During the Class Period, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for CPPs containing the Relevant AIs.

559.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Virginia.

560.    Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

561.    Defendants' unlawful conduct substantially affected Virginia's trade and commerce.

562.    Defendants' conduct was willful.

563.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Virginia Class have been injured in their business or property and are

93

threatened with further injury.

564. Accordingly, members of the Virginia Class seek all forms of relief, including treble damages or $1000 per violation, whichever is greater, plus reasonable attorneys' fees and costs under Va. Code Ann. § 59.1-204(A), *et seq.*

## COUNT FIFTY-FIVE

### Violation of the West Virginia Consumer Credit and Protection Act (W. Va. Code §§ 46A-6-101, *et seq.*)
**(Against All Defendants)**

565. By reason of the conduct alleged herein, Defendants have violated the West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-6-101, *et seq*.

566. The violations of federal antitrust law set forth above also constitute violations of Sections 46A-6-101, *et seq*. of the West Virginia Code.

567. Plaintiffs reserve their right to bring a claim under W. Va. Code §§ 46A-6-101, *et seq.* If necessary, Plaintiffs will amend to add specific claims under W. Va. Code §§ 46A-6-101, *et seq.*

## COUNT FIFTY-SIX

### VIOLATION OF STATE COMMON LAW UNJUST ENRICHMENT LAWS
**(Against All Defendants)**

568. The preceding factual statements and allegations are incorporated by reference.

569. As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of CPPs containing the Relevant AIs.

570. Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs and members of the classes in the following states: Arizona, Arkansas, California, District of Columbia, Florida,

94

Guam, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin.

## **RELIEF REQUESTED**

**WHERFORE,** Plaintiffs respectfully request the Court to certify this action as a class action, appoint them as the class representatives, and appoint their counsel as Class counsel. Plaintiffs further request that Defendants be cited to appear and answer this action, and, upon final trial or hearing, judgment be entered that the above-described CPP loyalty program scheme, and the above-described wrongful and anticompetitive acts engaged in by Defendants in furtherance thereof, violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1; 2, and Section 3 of the Clayton Act, a restraint of trade or commerce in violation of state antitrust and unfair competition laws alleged herein, violations of the state consumer protection and unfair trade practices laws alleged herein, violations of state common law unjust enrichment laws, and further, judgment be entered, favor of Plaintiffs and Class Members, and against Defendants, as follows:

(i)     that Plaintiffs and Class members have been (and continue to be) injured in their businesses and property as a direct and/or proximate result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law;

(ii)    that Plaintiffs and Class members have been (and continue to be) injured in their businesses and property as a direct and/or proximate result of Defendants' violations of Section 2 of the Sherman Act, 15 U.S.C. § 2 and listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law;

(iii)   damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of Plaintiffs and the members of the Classes be entered against defendants in an amount to be trebled to the extent such laws permit;

(iv)    permanent injunctive relief preventing Defendants from continuing their unlawful acts in violation of the Sherman Act;

95

(v)      their attorneys' fees, litigation expenses, and court costs through the trial and any appeals of this action;

(vi)     pre-judgment and post-judgment interest at the highest lawful rate; and

(vii)    such other and further relief to which Plaintiffs and Class members are justly entitled.

## JURY TRIAL DEMANDED

Pursuant to FED. R. CIV. P. 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Date: March 29, 2023

By: */s/ Kevin G. Williams*
Kevin G. Williams, N.C. State Bar No. 25760
Alan M. Ruley, N.C. State Bar No. 16407
**BELL, DAVIS & PITT, P.A.**
P.O. Box 21029
Winston-Salem, North Carolina 27120-1029
T: (336) 722-3700
kwilliams@belldavispitt.com
aruley@belldavispitt.com

Richard L. Coffman
**THE COFFMAN LAW FIRM**
3355 W. Alabama, Suite 240
Houston, TX 77098
T: (713) 528-6700
rcoffman@coffmanlawfirm.com

*Counsel for Plaintiffs and the Putative Class*

96